# B. L. LYMAN v. HORACE DALE, Appellant.

### Division One, December 2, 1914.

1. **NEGLIGENCE: Pleading in Justice Court.** If a plaintiff elects to plead his cause of action brought in a justice of the peace court, he is bound by the allegations of his statement filed therein the same as he would be by the allegations of a petition filed in the circuit court. For instance, if he sues in tort, and specifically states the negligence on which he relies to recover, he must recover for that negligence and none other.

2. ————: **Allegation and Proof: Wild Mule.** Where plaintiff charges that defendant was guilty of negligence in handling a "wild and unruly mule," which, as it was being led along a public street, ran into his buggy and broke down a wheel thereof, he cannot recover damages unless he proves that the mule was "wild and unruly."

    *Held*, by LAMM, J., concurring, that, there being no evidence tending to show the mule was "wild and unruly," such a mule is not *per se* a nuisance, a vicious animal, so that when led by a halter, his owner must answer for damage done by his hind foot to the wheel of a passing buggy, or other acts.

3. **NEGLIGENCE: Leading Mule Upon Public Street: Five-Foot Rein.** The leading of a mule upon a public street, with a halter rein five or six feet long, is not negligence, unless some

262Mo23

vicious propensity of the animal be pleaded and shown; and the court should so declare as a matter of law.

*Held*, by LAMM, J., concurring, that it is not negligence to ride one mule and lead another along a public street unless they are halter-yoked "neck and neck;" and especially in this case, because the injury to plaintiff's buggy was caused by the mule's hind leg getting into the wheel and there is no causal connection between the injury to the wheel caused by the hind leg and the failure to halter the mules neck and neck.

4. ———: ———: ———: **Expert Testimony.** Experts are not competent to testify that the proper way for handling mules being led along a public street is to halter them closely together. The matter is not one of expert exposition.

5. ———: ———: ———: ———: **No Objection.** Where the question is not one calling for opinion evidence the case is not changed on appeal by the fact that expert testimony was admitted without objection.

Appeal from Greene Circuit Court.—*Hon. James T. Neville*, Judge.

REVERSED.

*W. D. Hubbard* and *J. T. White* for appellant.

The court erred in overruling defendant's demurrer to the evidence: (1) The negligence alleged was leading "a wild and unruly mule" in a "careless and negligent manner." There was a total failure of proof. The mule was quite gentle. A careless manner of leading a gentle mule is not alleged. In order to recover plaintiff was obliged to prove that the mule was wild and that defendant knew it. Cathorn v. Walsh, 7 Mo. App. 588; O'Neil v. Blase, 94 Mo. App. 662. It is not alleged that defendant knew the mule was wild or unruly, and hence no cause of action is stated. (2) There is no evidence of negligence whatever sufficient to make out a case, even if the petition had been in accordance with the facts. (a) There is no evidence that leading a gentle mule, holding the halter rope by hand is negligence. Common sense teaches that it is not. One

on first thought would not think of leading a Missouri mule in any other way. Of course, it might occur to one that "wild and unruly mules" should be necked together. (b) It is certainly not a negligent act to lead a mule by a five-foot rope. That is as close as one desires to get to this same Missouri mule. (3) Leading the mule in the manner complained of was not the proximate cause of the accident. The obstruction in the street caused the mule to shy. The length of the rope would not prevent the mule from breaking loose. The obstructions were the proximate cause. Hodges v. Railroad, 135 Mo. App. 683; Lawrence v. Ice Co., 119 Mo. App. 327; Bokamp v. Railroad, 123 Mo. App. 270; Haley v. Railroad, 179 Mo. 35; Saxton v. Railroad, 98 Mo. App. 494.

*Roscoe Patterson* for respondent.

GRAVES, J.—This case involves the magnificent sum of five dollars. It reaches us under a certification from the Springfield Court of Appeals. We are enlightened by three well written opinions from the three respective members of that court. The facts we shall state for ourselves. Plaintiff having had one wheel of an old buggy somewhat demolished by coming in contact with a mule belonging to defendant, but being led by an employee of defendant, sought damages therefor before a justice of the peace, in October, 1909. He thus challenges his enemy in an amended petition filed before such justice:

"Plaintiff for an amended petition states that on the 2d day of October, 1909, at the county and State of Missouri, he was driving a horse and buggy along Walnut street, between South and Jefferson streets, in the city of Springfield, on the right hand side of the street; that defendant's agent and employee, on the aforesaid date, was leading a wild and unruly mule along the aforesaid street in such a careless and negli-

gent manner as to permit said mule to run into and against plaintiff's said buggy, thereby injuring and breaking the wheel and axle of said buggy and damaging the same to the extent of five dollars.

"Plaintiff further states, that at the time of the accident aforesaid, defendant's agent and employee leading said mule was acting in the scope of his employment.

"Wherefore plaintiff prays judgment in the sum of five dollars."

As we gather the facts plaintiff has been successful throughout from the justice's court up to the present. In the Court of Appeals his success was by a divided court. In this court he stands behind the fortification erected by his judgment, and submits his case here without brief. A yellow slip of paper found in the files here bears the ominous inscription, "The Celebrated Mule Case," and nothing more. Why we were thus enlightened by this otherwise silent monitor we know not. It at least admonishes to look well to the facts. Plaintiff and his brother and father-in-law were driving east on Walnut street in Springfield, Missouri, in plaintiff's buggy, and at a point where there was some digging in the street and some brick piled up in the street, met defendant's employee, James S. Parker, who was riding one mule and leading another; both mules were of good size, and the one being led was gray in color, if the color is material. According to plaintiff's evidence the halter strap by which the mule was led was five or six feet long—two witnesses say five, and another says five or six feet. It was being held near the end. In passing the bricks the mule shied across to the buggy and got his hind leg between the shaft and the wheel and in extricating itself damaged the wheel. Plaintiff's theory of the case is made to appear by the following evidence. Plaintiff himself says:

"Q. Do you know the customary manner of managing mules when they are being led over the street? A. I don't know what lots of people do, but I know what I do with them. I would neck them together so they could not spread all over the street.

"Q. How would be a proper way to handle them? A. That would be a proper way to handle them I think, would be to neck them together when you go through a crowded place like that.

"Q. How was he leading this mule? A. At the end of the halter rope.

"Q. How long was that rope? A. About five feet, the best I could tell."

The brother said:

"Q. Tell the court the proper manner to handle them? A. In a place where you are likely to have any difficulty with mules you neck them right up short together.

"Q. Can they be handled at all by giving five feet of rein? A. No man can handle a mule of any size by a halter rein. If you are handling a mule you have got to halter him up close to you."

The father-in-law said:

"It was his hind leg — got it in between the wheel and shaft. I said the front wheel. That is all I know about it. I didn't see any misbehavior in the mule until we got right up to them. He shied at something. I don't know what it was. There was a lot of brick on the north side and some dirt thrown up there. If there were any red lights there they were not lit up, because it wasn't dark enough. I quit work that day at six o'clock. I had not taken any whiskey. I don't drink. We were sitting in the seat and he was sitting on our knees. This did not happen very suddenly. It didn't take but a few minutes, but the mule got the best of us. It was somewhere about a minute in happening. I did not see any misbehavior in the man who was riding the other mule, only he couldn't handle the

mule, is all. He didn't have them up so he could handle them. I am not very much of a mule-handler. He could have tied them up closer than he did. I don't think he was tied up at all. I think he was leading the mule at the end of the rope."

There is no evidence in the case to the effect that the mule in question was wild and unruly, or that defendant had any knowledge of the animal being unruly or wild, if it was so, in fact. Defendant said that the mule was well-broke, but a little high-lifed, and this is as far as the evidence in behalf of the defendant adds to plaintiff's case. Defendant demurred to the evidence at the close of the plaintiff's case and again at the close of the whole case. Plaintiff's right to recover under the pleadings and under the evidence is thus squarely presented.

I. There are at least two reasons why this judgment should be reversed. It is true that in justices' courts the same strict formalities of pleadings are not required as in the circuit court, but it is further true that, if the plaintiff elects to plead in strictness in such court, he is bound by his pleadings there as he would be elsewhere. By this we mean, if he is suing in tort, and specifically states the negligence upon which he relies to recover, he must recover for that negligence and none other. In the case at bar, what is the negligence upon which the plaintiff seeks to recover? Is it the negligent handling of a mule, an ordinary average mule, or is it the negligent handling of a *wild and unruly mule?* And if the latter, has there been a case made? This is the first proposition in the case. We have set out in full the plaintiff's statement of his cause of action. A reading of that statement shows that the plaintiff was undertaking to charge the careless and negligent handling of "a wild and unruly mule." Counsel for plaintiff,

*Pleading in Justice's Court: Allegations Must be Proved.*

who drew and signed the petition for plaintiff, recog-, nized that what would be a negligent handling of a wild and unruly mule might not be a negligent hand- ling of an ordinary mule. He canvassed his facts and then charged that defendant was guilty of a negligent handling of "a wild and unruly mule." This was the case defendant was called upon to meet. When, there- fore, it was made to appear that the defendant had not handled "a wild and unruly mule" at all, the case stated had failed. Under the pleadings the defendant was not required to come prepared to meet the ques- tion of a negligent handling of an ordinary mule, but on the other hand the plaintiff if permitted to recover, must recover upon the case made by his pleadings. Under the case pleaded, his proof failed, and the court should have directed a verdict for the defendant.

II. But even grant it that the petition in this case is in such form and substance as to permit a recov- ery upon the proof of a negligent handling of a mule, without reference to the "wild and unruly" character- istic of the animal, as two of the judges of the Court of Appeals thought, yet should there have been a re- covery under the evidence? We think not.

Plaintiff's theory is that the leading of a mule, somewhat "high-lifed" or high spirited, upon a street, where a portion of the street was torn up by digging, and in which was piled bricks in a long continuous row or pile, by a halter, with a rope five feet long, was neg- ligence. There is no question but that there was ample space in the obstructed street for the same passage of both the buggy and the mules. It is true that plain- tiff's witnesses say that the mules should have been haltered together or something of that kind. This is their expert view of the situation, but we hardly think that the question is one calling for opinion evidence, and although such was admitted without objection, the case here is not changed by reason of that fact. [St.

Louis v. Roche, 128 Mo. 541; Boggs v. Laundry Co., 171 Mo. 282; Thompson on Trials, sec. 691.]

The use of a halter with a rein of five or six feet for the leading of both horses and mules upon the public highway is one of such long standing that expert testimony has no place in such a case. Not only so, but such a leading is not negligence, at least it is not negligence unless some vicious propensity of the animal be pleaded and shown. In this case we have no vicious propensity pleaded or proven. It is true that the petition charges that the mule was "wild and unruly" (not strictly a vicious propensity), but even that was not shown. Without some proof of vicious propensities, the trial court should have said that the mere proof that the defendant led the mule by a halter rein five or six feet long was no evidence of negligence upon his part. To hold that such conduct amounted to negligence is to overthrow all common knowledge as to the handling of animals upon the public highways. Courts must not blind themselves to common knowledge. The proof made in this case failed to show negligence in any degree, and the judgment from start to finish should have been for defendant. [Eddy v. Union R. Co., 56 Atl. 677.]

We regret to feel constrained to thus abruptly terminate "The Celebrated Mule Case," but it should have been so determined long since. Let the judgment of the circuit court be simply reversed so that there will be an end to the controversy.

All concur; Lamm, J., in separate opinion.

## CONCURRING OPINION.

LAMM, J.—It was Dr. Johnson (was it not?) who observed that Oliver Goldsmith had "contributed to the innocent gayety of mankind." (Nota bene: If, as a pundit tells me, it was Garrick and not Goldsmith Johnson spoke of, and if in quoting I misquote, then,

memory has played a trick upon me and a learned bar will correct me. Time and weightier matters press me to go on and leave the "quotation"(?) stand.) The function of this suit is somewhat the same. Beginning with the "J. P's" it has reached the "P. J's," and its journey has run the gamut of three courts, one above the other. Now, *secundum regulam*, it, a fuss over five dollars, has reached the highest court in the State for final disposition—all this because (1) of divergence of opinion among our learned brethren of the Springfield Court of Appeals, and (2) the provisions of the Constitution in that behalf made and provided. However, if the amount at stake is small, the value of the case for doctrine's sake is great.

As I see it, the case is this: Dale, a man of substance, a farmer, owned a brown and a gray mule, both young and of fine growth; one saddlewise, the other otherwise. Both, used to the plow and wagon, were entitled to the designation "well-broke and gentle." One Parker was Dale's manservant and in the usual course of his employment had charge of these mules. On a day certain he had driven them to a water wagon in the humble office of supplying water to a cloverhuller in the Ozark region hard by its metropolis, to-wit, Springfield. Eventide had fallen, i. e., the poetical time of day had come when the beetle wheels his droning flight, drowsy tinkling lulls the distant folds and all the air a solemn stillness holds. In other words, dropping into the vernacular, it was time to "take out." Accordingly, Parker took out, with his mind fixed on the watch dog's honest bark baying deep-mouthed welcome as he drew near home. He mounted the ridable mule. He says he tied the other to the hames of the harness on the ridden one by a four-or-five-foot halter rope, and was plodding his weary way homeward *a la* the plowman in the Elegy. The vicissitudes of the journey in due course brought him to Walnut street in said city of Springfield. At a certain

place in that street the city fathers had broken the pavement and made a "rick of brick" aside a long hole or ditch. Hard by this rick of brick was a ridge of fresh earth capped by a display of red-lantern danger signals. It seems the unridden mule crowded against the ridden one and harassed Parker by coming in scraping contact with his circumjacent leg. Any boy who ever rode the lead horse in harrowing his father's field will get the idea. In this pickle he took hold of the halter rope, still fastened to the hames, to keep the unridden mule from rasping his said leg. It might as well be said at this point that witnesses for plaintiff did not observe that the end of the rope was attached to the hames of the ridden mule. As they saw it, Parker was leading the mule. As will be seen a bit further on, at this point a grave question arises, to-wit, is it negligence to lead a mule by hand or should he be fastened "neck and neck" to his fellow? But we anticipate.

Going back a little, it seems as follows: At about the time Parker had reached said part of Walnut street, plaintiff and two others were in a buggy pulled by a single horse and on their own way home to the country. So equipped, these several parties met face to face. At this point it will do to say that while the mules were used to being on the water wagon, it is not so clear that these travelers three were. There are signs of that artificial elation in the vehicle party that in the evening springs from drinking ("breathing freely"), but on the morning after produces the condition of involuntary expiation Dr. Von Ihring calls "katzenjammer." They disavow being half-seas-over or drunk. Their chief spokesman, as descriptive of the situation, in part told his story mathematically in this fashion: "*I had not drank so much but what I kept count. I can keep count until I take three and hadn't quit counting yet.*" In the course of their journey they, too, came to the brick rick, the ditch, the ridge

of dirt and the red lights on Walnut street. There they met, as said, the gray and brown mule and Parker face to face. When mules and rider approached and passed the three travelers, all on the same side of the ditch, the led mule, whether scared by the hole in the ground, the rick of brick or the ridge, is dark, shied from his fellow ("spread" himself) and presently his hind leg was mixed up with the shafts and wheel of the buggy. When the *status quo ante* was re-established both leg and wheel were found damaged. Subsequently a blacksmith offered to repair the damages to the wheel for, say, a dollar and a half. This sum defendant, though denying liability, was willing and offered to pay; but plaintiff's dander was up and he as buggy-owner demanded a new wheel worth five dollars, and sued.

In the justice court, defendant lost outright and appealed. In the circuit court, the same. The learned judges of the Court of Appeals could not agree (the *furor scribendi* being much in evidence and three learned opinions falling from their several pens) and sent the case here—and here it is.

My Brother GRAVES has well disposed of it on certain grounds, but, the theme being the Missouri mule and state pride calling for further exposition, the said *furor scribendi* has seized me—witness:

(a) It is argued that it was negligence to ride one mule and lead its fellow by hand. That they should be halter-yoked "neck and neck." Parker says he necked them in a way, but plaintiff takes issue on the fact. Allowing credit to plaintiff's evidence, two questions spring, *viz.*: First, is the neck-and-neck theory "mule law" in this jurisdiction? Second, if so, then was the absence of the neck-and-neck adjustment the proximate cause of the injury? We may let the first question be settled in some other mule case and pass to the second as more important. It will be observed that the neck and forequarters of the mule did not do the dam-

age. *Contra,* the hind quarters or "business end" of the mule were in fault. We take judicial notice of facts of nature. Hence, we know that haltering a mule neck-and-neck to another will not prevent his hind parts spreading. His neck might be on one line, but his hind legs and heels might be on another, a divergent one. True the mental concept relating to shying or spreading would naturally originate in the mule's head. But it must be allowed as a sound psychological proposition that haltering his head or neck can in nowise control the mule's thoughts or control the hinder parts affected by those thoughts. So much, I think, is clear and is due to be said of the Missouri mule, whose bones, in attestation of his activity and worth, lie bleaching from Shiloh to Spion Kop, from San Juan to Przemysl (pronounced, I am told by a scholar, as it is spelled). It results that causal connection between the negligence in hand and the injury is broken and recovery cannot go on the neck-and-neck theory. This because it is plain under the distances disclosed by the evidence that the mule's hind legs could reach the buggy wheel in spite of a neck-and-neck attachment.

(b) The next question is a bit elusive, but seems lodged in the case. It runs thus: There being no evidence tending to show the mule was "wild and unruly" as charged, is such a mule *per se* a nuisance, a vicious animal, has he a heart devoid of social duty and fatally bent on mischief when led by a halter on the street of a town, and must his owner answer for his acts on that theory?

Attend to that view of it:

(1) There are sporadic instances of mules behaving badly. That one that Absalom rode and "went from under" him at a crisis in his fate, for instance. So it has been intimated in fireside precepts that the mule is *unexpected* in his heel action, and has other faults. In Spanish folk lore it is said: He who wants a mule without fault must walk. So, at the French

chimney-corner the adage runs: The mule long keeps a kick in reserve for his master. "The mule don't kick according to no rule," saith the American negro. His voice has been a matter of derision and there be those who put their tongue in their cheek when speaking of it. Witness the German proverb: Mules make a great fuss about their ancestors having been asses. And so on, and so on. But none of these things are factors in the instant case; for here there was no kicking and no braying standing in the relation of *causa causans* to the injury to the wheel.

Moreover, the rule of logic is that induction which proceeds by merely citing instances is a childish affair and, being without any certain principle of inference, it may be overthrown by contrary instances. Accordingly the faithfulness, the dependableness, the sure-footedness, the endurance, the strength and the good sense of the mule, all matters of common knowledge, may be allowed to stand over against his faults and create either an equilibrium or a preponderance in the scales in his favor. He, then, as a domestic animal is entitled to the doctrine that if he become vicious, guilty knowledge (the *scienter*) must be brought home to his master, precisely as it must be on the dog or ox. The rule of the master's liability for acts of the ox is old. [Ex. 21:29.] That for the acts of the dog is put this way: The law allows the dog his first bite. Lord Cockburn's *dictum* covers the master's liability on a kindred phase of liability for sheep-killing, to-wit: Every dog is entitled to at least one worry. So with this mule. Absent proof of the bad habit of "spreading" when led and the *scienter*, liability did not spring from the mere fact his hind leg (he being scared) got over the wheel while he was led by a five-foot halter rope; for it must be held that a led mule is not a nuisance *per se*, unless he is to be condemned on that score out-and-out because of his ancestry and some law of heredity, some asinine rule, so to speak, a question we take next.

(2)   Some care should be taken not to allow such scornful remarks as that "the mule has no pride of ancestry or hope of posterity" to press upon our judgment. He inherits his father's ears, but what of that? The ass's ears, presented by an angry Apollo, were an affliction to King Midas, but not to the mule. He is a hybrid, but that was man's invention centuries gone in some province of Asia Minor, and the fact is not chargeable to the mule. So, the slowness of the domestic ass does not descend as a trait to the Missouri mule. It is said that a thistle is a fat salad for an ass's mouth. Maybe it is also in a mule's, but be it so, surely his penchant for homely fare cannot so far condemn him that he does not stand *rectus in curia.* Moreover, if his sire stands in satire as an emblem of sleepy stupidity, yet that avails naught; for the authorities (on which I cannot put my finger at this moment) agree that the Missouri mule takes after his dam and not his sire in that regard. All asses are not four-footed, the adage saith, and yet to call a man an "ass" is quite a different thing than to call him "mulish" (*vide,* the lexicographers).

Furthermore, the very word jack-ass is a term of reproach everywhere, as in the literature of the law. Do we not all know that a certain phase of the law of negligence, the humanitarian rule, first announced, it has been said, in a donkey case (Davies v. Mann, 10 Mees. & Wels. 545) has been called, by those who deride it, the "jack-ass doctrine?" This on the doctrine of the adage: Call a dog a bad name and then hang him. But, on the other hand, to sum up fairly, it was an ass that saw the heavenly vision, even Balaam, the seer, could not see and first raised a voice against cruelty to animals. [Num. 22:23 et seq.] So, did not Sancho Panza by meditation gather the sparks of wisdom while ambling along on the back of one, that radiated in his wonderful judgments pronounced in his decision by the common-sense rule of knotty cases in

Caruthersville v. Huffman.

the Island of Barataria? Did not Samson use the jaw-
bone of one effectually on a thousand Philistines? Is
not his name imperishably preserved in that of the
fifth proposition of the first book of Euclid—the *pons
asinorum?* But we shall pursue the subject no far-
ther. Enough has been said to show that the ass is not
without some rights in the courts even on sentimental
grounds; *ergo,* if his hybrid son, tracing his lineage as
he does to the Jacks of Kentucky and Andalusia, in-
herits some of his traits he cannot be held bad *per se.*
*Q. E. D.*

It is meet that a five-dollar case, having its tap
root in anger (and possibly in liquor), should not drag
its slow lengths through the courts for more than five
years, even if it had earned the *sobriequet* of "the cele-
brated mule case."

The premises herein and in the opinion of Brother
GRAVES all in mind, I concur.