McCREADY, by next friend, Respondent, v. STEPP, Appellant.

St. Louis Court of Appeals, February 2, 1904.

1. **MASTER AND SERVANT: Duty to Furnish Safe Appliances: Animals.** It is the duty of the master to furnish, for use of servants in his employment, appliances and instruments, safe and suitable for the purposes for which they are furnished; and this rule embraces animals to be used by the servant as well as inanimate appliances.

2. ———: ———: ———: **Notice to Master.** To entitle a servant to recover for injuries received from a dangerous horse with which he was put to work, it was not necessary that the master should have had actual knowledge of the vicious character of the horse, but notice of circumstances which would put a reasonably prudent man on his guard, was sufficient.

Appeal from Greene Circuit Court.—*Hon. J. T. Neville,* Judge.

AFFIRMED.

*Hamlin & Mason* and *Geo. Pepperdine* for appellant.

(1) Where there is no evidence of a fact, or no evidence from which a jury can legitimately infer its existence, and the existence of such fact is vital to the case, the court should take the case from the jury, and not allow the jury to infer its existence without evidence. O'Mally v. Railroad, 113 Mo. 319. The mere proof that an injury has happened does not authorize submitting the question of negligence to a jury. Murphy v. Railroad, 115 Mo. 111; Yarnell v. Railroad, 113 Mo. 570. The dangerous character of the horse, and defendant's knowledge thereof are material facts in the case. The burden of proving both of which is on plaintiff. Smart v. Kansas City, 91 Mo. App. 586; Hester v. Dold Packing Co., 84 Mo. App. 451; Murray v. Railroad, 101 Mo. 236; Benoit v. Troy & L. R. Co., 154 N. Y. 223.

*A. H. Wear* and *J. T. White* for respondent.

(1) It is the duty of the master to provide suitable and safe appliances for his servants, and if he fails to do so, or puts the servants in charge of appliances which are unsafe, when he has reasonable grounds to believe they are unsafe, he is liable for any damages which may result. A horse is an instrument within the meaning of the above rule. Leigh v. Railway, 54 N. W. (Neb.) 134; Hammond v. Johnson, 56 N. W. (Neb.) 967; McGarry v. Railroad, 18 N. Y. Sup. 195; Knickerbocker Ice Co. v. Finn, 80 Fed. 483. (2) The notice required which would make the defendant liable for the damage caused by his vicious animal is only knowledge of such facts as would put a reasonably prudent man upon his inquiry. If he knew, or by the exercise of reasonable care could have known that the animal was dangerous, it is sufficient. Ray on Neg. of Imposed Duties, 605; O'Neal v. Blase,

94 Mo. App. 648.    (3)   It is the duty of the master to use reasonable care and foresight in procuring appliances to be used by those in his employ, and the servant has a right to rely upon the master performing his duty. Dedrick v. Railway, 21 Mo. App. 433; Porter v. Railroad, 60 Mo. 160.

### STATEMENT.

From judgment rendered upon a majority verdict of a jury in favor of plaintiff, defendant has appealed. The petition for plaintiff's cause of action, embraced averments that defendant, a retail grocer in Springfield, had in use a one-horse wagon for delivery of goods sold to his customers, and about August 13, 1902, while in defendant's employ and about the duties of such employment, defendant wrongfully ordered plaintiff, a minor, to deliver groceries and run such wagon, having at the time hitched thereto a horse, wild, vicious, dangerous and unsafe to use for such purposes, and which wagon was therefore unsafe. That plaintiff was ordered and required by defendant to go in and run such wagon with such horse and deliver goods. That while in performance of his duty in running and riding in such wagon for purpose of delivering goods therefrom, under the order of defendant, the horse became unmanageable and ran away, breaking plaintiff's leg in two places, and plaintiff had received such hurts by reason of the negligence of defendant in requiring him, a boy of fourteen years, to run such wagon and deliver goods with such dangerous horse thereto attached. That the character of the horse was bad, and he was a wild and dangerous animal, liable to run away and kick, and its character was known to defendant at time he required plaintiff to go in the wagon; that plaintiff was ignorant of the character of the horse, and inexperienced, as a boy of such age usually is, in management of horses, and the injuries sustained were then detailed and judgment for damages prayed.

Defendant answered in a general denial.

The facts disclosed at the trial, in effect, were that plaintiff had been in the employ of defendant for several months, with duties of assisting in a grocery store and delivering goods to customers, for which defendant made use of two wagons with two drivers, plaintiff accompanying the driver of a wagon to assist in delivering groceries; that on August 13, 1902, plaintiff was ordered to go with Beltz, who was driving one of the wagons, and while making deliveries, the horse suddenly became unmanageable, kicked and ran off. It appeared that one of defendant's horses commonly driven in one of the wagons had become ill, and the horse causing the mischief had been offered for sale to defendant, the day preceding the accident and had been left with him on trial. On the day after its delivery to defendant, the horse was hitched up in one of the wagons and had been driven by Beltz for two delivery trips, and the third had started when the occurrence took place.

REYBURN, J. (after stating the facts as above.)— A general charge of error is made against the action of the trial court in giving and refusing instructions; but no specific error is assigned, and the single comprehensive instruction given, presented and embraced the various features of the case, fairly submitted the issues to the jury if the evidence warranted such submission, which will be later considered, and is unobjectionable. The controlling element of the case involves the proposition, whether, under the evidence, the case should have been permitted to go to the jury, or whether the instruction directing a verdict for defendant should have been given, either at close of plaintiff's case, or at termination of all the evidence, at both of which stages it was requested and declined. It was the duty of Stepp, as master, to furnish for the use of his servants, while in course of his employment, appliances and instruments proper, safe and suitable for the purposes for which they

were furnished and for the performance of the services required; and this rule extends to and embraces instruments and appliances, animate as well as inanimate. McGarry v. R. R., 18 N. Y. Supp. 195; Knickerbocker, etc., Co. v. Finn, 80 Fed. Rep. 483; Leigh v. R. R., 54 N. W. Rep. 134; Hammond v. Johnson, 56 N. W. Rep. 967; Labatt, Master & Servant, sec. 206. To entitle the plaintiff however, to recovery in this case, it was incumbent on him to introduce testimony tending to prove not alone the dangerous character of the animal causing the injury, but to show as well that defendant knew, or by the exercise of proper care and diligence might have known of the vicious and dangerous character of the horse. Knowledge, actual or constructive, on the part of the master is a constituent element of such negligence essential to create any liability. Labatt, Master & Servant, chap. 14, sec. 206. The testimony upon these branches of the case was as follows: Jennings who took the horse to defendant for sale, deposed as follows:

"Q. When you went to Stepp's what conversation did you and Mr. Stepp have in relation to this horse? A. Well, he was wanting to know if the mare would work, and I told him; 'O, yes, she would work all right anywhere he put her.' He asked me if she was gentle. I says, 'Yes, but you have to be careful with her. She hasn't been here for a year; hadn't been worked for a good while. Been running on pasture.' He wanted to buy her, and I asked him one hundred dollars for the mare, and at last I told him he could have her for ninety-five dollars, and he says 'I would rather take that mare and keep her for awhile,' and asked me if I could come back Monday, and I told him I couldn't say that. He would have to go out and see Mr. Hodgson. He was out in the wagon and he went out and asked Mr. Hodgson if he could keep the mare and work her until Friday when I came back, and he would probably buy her if she suited him. And I says, 'You can keep her if you will be responsible.' He says, 'I will be responsible if it is

my fault;' and he says, 'Of course if she should lie down and die she might do the same with you;' and then Hodgson or me, and probably both says, 'You want to be careful and not let any boy drive her, because she is pert and has not been driven, and she won't stand a whip.' He says, 'I will have a man, and not let any boy drive her.'

"Q. Was anything said there by Mr. Stepp in regard to his having heard that this mare was a runaway mare? A. Well, I don't know as he did to me. If he did I have forgotten.

"Q. Did you have a conversation with him at any other time in which he said he knew at the time you brought the mare there and left her he had heard she was a runaway mare? A. He told me afterwards that he had heard she had a runaway. He told me afterwards that she had run away.

"By the court:

"Q. Now let us understand, that he told you afterwards that at the time he was talking to you the first time he had heard she had run away, or told you he had heard it since that? A. I don't know as he said that. He told me afterwards that he had heard she would run away, but I don't know whether it was before he got the mare or not."

A lady customer of defendant thus testified:

"Q. Now, I will ask you to state if you were in Stepp's store—you know Mr. Stepp? A. Oh, yes.

"Q. How long have you known him? A. I don't know. I believe ever since he has been in the grocery business on Grant street. I don't know how many years. Perhaps ten or twelve years.

"Q. I will ask you to state if you were in his store on the morning of the 13th of August last? A. I think so, I didn't take any notice of the date. The morning of the occurrence of the accident I was in there.

"Q. Now shortly after you left there, to fix the

date certainly in your mind, you heard of the boy being hurt? A. Yes, sir, a very short time.

"Q. Now I will ask you to state if you had any conversation with Mr. Stepp while you were in his store that morning in regard to a horse? A. Yes, sir.

"Q. Just tell the jury now what that conversation was? A. Well, I went in the store for something, I don't remember what, in the front door, and there was no one in there but Mr. Stepp and he was very busy doing up the grocery deliveries, and Harry was carrying groceries from the counter to the side door, and I had to wait until he got through for him to wait on me, and Mr. Stepp just remarked to me, 'I have got a new horse this morning, and he is a dandy,' was his remark; and when he got through with those things, and came around to get those things, and he says, 'Wait until the boys drive around and see it.' I am very fond of horses, and I waited a moment until Mr. Beltz and Harry came around. Mr. Stepp asked me if I didn't think he was pretty. I says, 'Yes, he is pretty in one way, but I think he is a bad looking horse;' and they stood there a little while in front of the door and Mr. Stepp said something about the groceries, and whether Harry was on the back of the wagon, or in the wagon I don't remember; but Mr. Stepp says to him, 'Get up there, sonny and you deliver the goods, and you be careful, and Mr. Beltz you hold the lines tight.' He cautioned them; and I said to the boy, 'You mind about going behind that horse.' I didn't like the way he looked. I couldn't tell you—he didn't kick, but he was a vicious looking animal, and shook his head and looked vicious, and as they drove away Mr. Stepp again said, 'Mr. Beltz, don't let go of the lines until you get back here.' "

The driver of the horse, Beltz, a witness for defendant, thus referred to the disaster and the cause.

"Q. Where did you make the first stop from the

time you first started? A. On Scott street at Mr. Bloom's.

"Q. Now, go ahead and relate the rest of the trip? A. Then we made another stop at Mr. Davis', and we made another stop at Mr. Hedge's, and that was when the accident happened.

"Q. Tell about the accident? A. And just as I started up there she commenced kicking and running right from the start, and she run some distance, not far, but she kept kicking all the time. She finally kicked the boy and hurt him.

"Q. What did you do? A. And as I was driving, and she broke the front rod that runs across in front to put your feet on for a brace. When she kicked and broke that I saw I couldn't hold her any longer, and I threw myself back in the wagon so I could come up against the seat where I would have a better brace to hold her. I seen I couldn't hold her there when she broke the rod, and I threw myself back in the seat so I could keep a better hold on her.

"Q. Did you hold on to the lines? A. Yes, sir.

"Q. How were you holding the lines? A. I was holding the lines with both hands.

"Q. What position were your hands? A. Something like this (indicating).

"Q. Have you handled horses quite a good deal? A. Yes, sir.

"Q. All your life? A. Off and on."

Defendant testifying on his own behalf, said:

"Q. I will ask you the question if before the time that these men came to your place on the evening of August 12th, if you had heard anything about this horse or knew anything about it? A. I had, but I didn't know at the time it was the same horse. But Mr. Renfro had owned the same animal down here probably a year before that, and I heard he had one to sell and I came over to see what he had."

It was obviously not necessary, that defendant

should have actual personal knowledge or proof of the vicious propensities of the horse; for the law would not afford him immunity until the horse had actually evinced to him its dangerous disposition by running away while in use by defendant, but notice of those circumstances, which should have placed a reasonably prudent man upon guard and which upon reasonable inquiry would have afforded information of the true character of the animal, were sufficient and imposed the same degree of responsibility on defendant as if possessed of actual knowledge. Upon the whole case there was sufficient testimony to submit to the jury, and the trial court was warranted in such course. The judgment, accordingly, will be affirmed. *Bland, P. J.,* and *Goode, J.,* concur.