FLORENCE WARNER v. ORIEL GLASS COMPANY, Appellant.—8 S. W. (2d) 846.

Division One, May 18, 1928.

1198

*Jones, Hocker, Sullivan & Angert* and *Willard A. McCaleb* for appellant.

*Mark D. Eagleton* and *Hensley, Allen & Marsalek* for respondent.

GRAVES, P. J.—The deceased husband of plaintiff was in the employ of the defendant, when he met with the occurrence which occasioned his death. The pertinent alleged negligence is thus stated in the petition:

"Plaintiff further states that at all times herein mentioned, on and prior to the 4th day of October, 1922, she was the lawful wife of Joseph Warner, who died in the city of St. Louis, Missouri, on the said 4th day of October, 1922, as hereinafter more particularly

described, and that plaintiff now is the surviving widow of said Joseph Warner, deceased, and institutes and prosecutes this suit as such within six months after his death aforesaid.

"Plaintiff further states that on or about the 23rd day of September, 1922, the said Joseph Warner was in the employ of the defendant, and while engaged in his duties as such for the defendant, he received serious injuries, which later resulted in his death on the said 4th day of October, 1922, which said injuries and death directly proximately resulted from negligence on the part of said defendant in this, to-wit:

"1. That said defendant did negligently and carelessly fail and omit to exercise ordinary care to furnish said deceased, Joseph Warner, with a reasonably safe team of mules, which he was required to drive and to which was attached a wagon on which said Joseph Warner was required to stand while unloading and loading said wagon, in that said mules had a habit of starting without warning or notice and did, on the occasion in question, start without warning or notice, while plaintiff's deceased husband, Joseph Warner, was on said wagon in the act of performing his duty, by means of which the team started forward and the said Joseph Warner was caused to be thrown from said wagon and seriously injured, as a result of which he died as aforesaid.

"2. That said defendant knew, or by the exercise of ordinary care on its part could have known, of the habit of said mules of starting as aforesaid, and of the danger, incident to their starting as aforesaid, in time, by the exercise of ordinary care, to have furnished the said Joseph Warner, deceased, with a reasonably safe team with which to prosecute his work as aforesaid."

A third allegation of negligence was withdrawn from the jury at the request of defendant and hence is not of interest now. The petition upon which the case was tried was an amended petition, and from it we get the foregoing charges of negligence. The answer was a simple general denial.

The appellant's statement of the pleadings substantially accords with the above, except it is added, "The reply was conventional." There was, in fact, no reply, and such is not shown by the record. The answer being a mere general denial there was no need for a reply. We state, supra, that the third ground of negligence was withdrawn from the jury at request of defendant. The exact facts are that by an offered instruction the defendant asked for such withdrawal, but this instruction, as asked, was refused, but was slightly modified, and given as modified. The slight modification helps the instruction in defendant's favor. Thus this alleged ground of negligence went out of the case. The sufficiency of the petition (which was an amended petition) was not challenged by demurrer. Upon trial before the

jury the plaintiff had a verdict for $10,000, and upon this verdict judgment was entered in her behalf. From such judgment the defendant appealed. The assignments of error, in this court, are but three and are thus stated:

"1. Respondent's amended petition does not state facts sufficient to constitute a cause of action.

"2. The court erred in refusing to give appellant's instructions in the nature of demurrers to the evidence, which instructions are numbered B and A.

"3. The court erred in admitting, over the objection of appellant's counsel, the following irrelevant, immaterial, incompetent and prejudicial evidence, to-wit: During the cross-examination of P. C. Belleville, by counsel for plaintiff, the following questions were asked, objections made and answers given."

In this assignment 3 is set out, at least, a substantial portion of the evidence conplained of and this we omit here because it will require more specific notice later. Notice should be taken of the fact that in the assignments of error no complaint is made as to the court's action in giving instructions for plaintiff, or in refusing to give instructions for the defendant, except as to the demurrers to the evidence—one at the close of plaintiff's case and one at close of whole case. The propriety of the instructions, whether given or refused (except the demurrers to the evidence), is not in the case. The principal instruction for plaintiff, as given by the court, is not even a matter of assigned error.

Deceased had been in the employ of defendant for some years, and was principally employed as a driver of a delivery wagon drawn by a team of old mules. A part of the time he worked at nights at the plant. The evidence tended to show that these mules were restless and would not stand still while the wagon was being loaded or unloaded, and that they would bite each other and suddenly jerk the wagon forward, and that this restless disposition grew worse as the mules grew older; that the foreman of defendant, under whom deceased worked, had knowledge of, and saw these things, for some time before the accident. The wife of the deceased had noticed them two or three times per week from 1913 (the date of her marriage to deceased) to the time of her husband's death. As to the characteristics of these mules both the wife (plaintiff herein) and one John Allen testified. The testimony of both of these witnesses tends to show full knowledge of the dispositions and acts of these mules by the defendant, through its foreman. The evidence shows a demand, by the deceased, for a safer team. Plaintiff's counsel have collated some of this evidence in their statement thus:

"In support of her allegation that the mules were not reasonably safe for the work and that defendant had knowledge of that fact,

plaintiff offered her testimony and that of John Allen, the witness above referred to, as follows:

"Plaintiff testified that she was familiar with the team of mules her husband drove while working for defendant. He frequently drove the team to their home when he stopped to get lunch. She testified:

"Q. Can you tell the jury what the characteristics of those mules were with reference to how they were managed and whether or not they were hard or easy to manage? A. They would always start when he would come to the house; they would start and get into the middle of the street, and the folks would come in and ask where the driver was, and the neighbors couldn't pass, and they went clear up as far as the sash-and-door company on Rutger street, at times, and at times they would stop there and wouldn't go at all."

About two weeks before the accident, plaintiff was at defendant's place, where she had gone to bring her husband his lunch. She heard her husband make a complaint about these mules to his foreman, Mr. Percy. Her testimony on this subject was as follows:

"Q. When did you hear such complaint, and to whom made? A. Several weeks before the accident I was down there, on account of bringing his lunch when he would be doing night work, and he came in and he explained to his foreman there that the mules were getting worse and wouldn't stop, at times they would start, and he said to tell the boss to get him a different pair of mules.

"Q. What did he say—the foreman? A. Well, he left and said he would."

On cross-examination, she stated that she had occasion to see these mules quite often; they were so bad that her husband would have her go to their front room, while he was eating his lunch, to watch the mules from the front window, so they would not get out into the middle of the street. Her husband had been driving these mules for seventeen or eighteen years. She married him in 1913, and from then on until his death she saw the mules two or three times a week. Quite often, when he came to the house, the mules would get out into the middle of the street, crossways sometimes, and he would have to run out and get them over to the side. Witness herself, from the front room, had observed the mules out in the middle of the street, and called to her husband to go down and pull them back. Witness observed this off and on; she observed that the mules were restless all the time after she and Mr. Warner were married; the mules would always start. Her husband told her, from the beginning, that these mules were restless, and they were getting worse all the time; that they were restless and would never stand still.

With reference to the complaint made by her husband to his foreman, plaintiff said, on cross-examination, that the incident oc-

curred about six or seven o'clock in the evening. She related the conversation as follows:

"Q. Just state what was said. A. Joe came in with the team, and he seemed to be excited, and he said to the foreman that the team was getting worse all the time and that he wanted another team.

"Q. Louder; I can't hear you very well. A. I say, Joe came in with the wagon, and he was kind of excited, and he said that the team was getting worse all the time and he would like for him to talk to the boss for a different team.

"Q. Did he say how they were getting worse? A. Yes, sir; they were getting worse, and he seemed to be excited about them that day.

"Q. Just state what he said. A. Well, he said to Pete, 'That team is getting worse all the time,' and he said, 'You will have to tell the boss to get a different team.'

"Q. Is that all he said? A. Yes, sir.

"Q. You are sure about that? A. Yes, sir.

"Q. What did the foreman say? A. He said, 'Yes,' he would tell him."

On redirect examination, she again related the conversation, stating:

"Why, he said that the mules were getting worse and he wanted a different team, that they would start all the time and that he couldn't handle them."

John Allen testified with reference to the characteristics of the mules in question, as follows:

"Q. These mules—did you have occasion to observe those mules before that day? A. I knowed them for five or six years or more.

"Q. You knew the mules? A. Yes, sir.

"Q. Tell the jury how those mules acted, as far as their starting up and the like of that was concerned. A. Well, any time that you would take and stop them anywhere they would take and bite at one another, and jerk backward and forward.

"Q. What effect would that have, as far as their moving off is concerned? A. It is bound to move the wagon.

"Q. Did you see that happen? A. I did; I seen the mules when they moved up in the alley there.

"Q. Did you see it happen on other occasions over at the glass company? A. Well, I have seen them move up from the door when they would be loading them.

"Q. And move up at times when the foreman and the others were around there, themselves? A. Sure, when they would be loading stuff there.

"Q. Would you say that occurred frequently, that they would do that? A. They do that any time you stop them; if you stop

them with the load anywhere they would bite one another and jerk forward.

"Q. ' Have you seen them when they would go away from the place and roam around the glass company? A. If you would leave them standing they would go away. Sure, they moved off.".

For the plaintiff the evidence tended to show that there was but one eye witness to the occurrence which resulted in the death of Warner (the deceased husband of the plaintiff), and this witness says that the wagon had been backed up to the doorway of a building upon the north side of an alley, which was paved with granite blocks; that deceased was standing up in the wagon, unloading from this wagon into the doorway of this building, some six by six timbers, which were ten or twelve feet long; that these mules suddenly jerked the wagon forward seven or eight feet, and this threw Warner from the wagon to the granite blocks of the alley. From the injuries there received, other evidence shows that Warner died shortly thereafter. Defendant had a witness who claimed to have seen the accident, who says that Warner did not fall from the wagon, but the evidence of this witness is brought into question on another question urged, and will be fully noted upon that point, in the course of this opinion.

For plaintiff's side of the case, the foregoing is an outline of both pleadings and evidence, which may or will require review in determining (1) whether or not the petition states a cause of action at all, (2) whether or not it defectively states a cause of action, which is cured by verdict, and (3) whether or not the evidence adduced made a case for plaintiff.

There may be some further details, but these are left to the opinion.

I. We have purposely made our statement of the pleadings and of the evidence rather full and complete. This because we could, if desired, discuss each of the three questions last above stated in our statement of the case. It must be borne in mind that the sufficiency of this petition to state a cause of action was not challenged by demurrer, nor even by objection to the introduction of evidence under it. This objection, now the chief corner stone of this appeal, seems to have been an afterthought and one occurring to counsel after the verdict. Counsel of the marked ability of counsel herein appearing for the defendant usually challenge a really bad petition by demurrer. We mean a petition which absolutely states no cause of action. But we fully appreciate the law of the case. If the petition wholly and absolutely fails to state any cause of action at all, objection to it can be made to it for the first time in this court. [Hudson v. Cahoon, 193 Mo. l. c. 557-558; Hanson v. Neil (which cites approvingly the Hudson case, supra), 215 Mo. l. c. 278; Hoffman v. McCracken, 168 Mo. l. c. 343; Paddock v. Somes,

102 Mo. l. c. 235; Sexton v. Street Railway, 245 Mo. l..c. 263; Ice & Cold Storage Co. v. Kuhlmann, 238 Mo. l. c. 702.]

But on the other hand if the petition merely *defectively* states a good cause of action, and the same is not challenged below, then such defectively stated cause of action is cured by the verdict, and cannot be thereafter challenged. [Ehrlich v. Mittelberg, 299 Mo. l. c. 300, 301; Rutledge v. Swinney, 261 Mo. l. c. 140; Sexton v. Street Railway, 245 Mo. l. c. 263; Ice & Cold Storage Co. v. Kuhlmann, 238 Mo. l. c. 702, 703.] Both matters are usually discussed in the same opinion. Thus in the Sexton case, supra, it is said:

"If the petition states no cause of action at all, then the question can be raised here for the first time. In this court such is horn-book law. On the other hand, if the petition defectively states a cause of action, and such petition is not attacked by motion or demurrer below, as is true in this case, then such petition will be held good after verdict. [R. S. 1909, sec. 2119.]"

But with the view we have of the law of this case, it will not be necessary to discuss this last suggested interesting question at all. We think the petition states a good cause of action, and that the evidence for the plaintiff made a case for her, under the petition. In fact if the petition states a cause of action, there can be but little question as to the sufficiency of the proof to make a case for the jury.

Both of these questions, however, we shall discuss more fully in the paragraphs to follow.

II. The petition herein states a good cause of action. This is a case of master and servant. The obligations of master to servant must be considered. It is the non-delegable and continuous duty of the master to furnish to the servant reasonably safe tools, appliances, instruments and instrumentalities with which to perform the work required to be performed by the servant. A failure to furnish such tools, appliances, instruments and instrumentalities is actionable negligence, as is the failure to exercise ordinary care to furnish the same. [Williams v. Pryor, 272 Mo. l. c. 620, and cases in said opinion cited and discussed.]

The instant case is brought upon this theory of the law, and not upon the theory that the mules were vicious toward man. In this kind of a case the habit or propensity of the animal need not necessarily be a vicious disposition toward man. In other words, the habit or propensity of the animal need only be such as to render such animal an unsafe instrumentality with which to do the work required of the servant. Of course, a vicious disposition toward man might render the animal an unsafe instrumentality for the use of the servant in the performance of the work required of him, and if so, this would likewise form the basis for a charge to the effect that the

master did not furnish the servant with a reasonably safe instrumentality with which to do the work required of the servant, but what we now say is that the animal's disposition or propensity to injure man is not a sole requisite for a cause of action of this kind, as between master and servant. Other and lesser habits and propensities of the animal may make such animal an unsafe and dangerous instrumentality for use by the servant in the performance of the work required of the servant by the master. In other words, viciousness toward man, or a disposition to injure man, is not a necessary element to a case of master and servant, but like lesser propensities may form the basis of the action. We are cited to no case of this court wherein the doctrine here involved is discussed. We are cited to Steffen v. Mayer, 96 Mo. 1. c. 423, and Lyman v. Dale, 262 Mo. 353. We wrote the latter case, and the question of master and servant was not in the case at all. In the Steffen case, supra, Steffen was a servant, but the question here involved was not discussed at all. Steffen, while a servant, had not been furnished with a team with which to perform his work. There was a team involved, but Steffen was not the driver of the team. The real question involved in this case was neither urged nor discussed in that case. We know of no case from this court touching the question, or a related question, except the very recent case of Johnson v. Corn Products Company, 319 Mo. 958, decided in April, 1928. The question there involved was the non-delegable duty of furnishing a reasonably safe place in which to work. Furnishing to the servant a reasonably safe place within which to work, in law, stands upon exactly the same footing as furnishing to the servant reasonably safe instrumentalities with which to do the work required. Both are non-delegable duties. In the Johnson case a man had been specially assigned to an elevator to open and close an elevator door while other men were engaged in removing tin from a car into the building. He was to open and close this door as the ingress and egress of the men unloading the tin required it. Johnson, the plaintiff in that case, was one of the men unloading the tin. Puckett, the man assigned to the elevator to open and close this door, as aforesaid, lowered the door and injured Johnson. In that case, RAGLAND, J., in speaking of the part played by Puckett (an animate factor in the case), said:

"In applying in the instant case the test just referred to, the question resolves itself into whether the act of raising and lowering the door was one related primarily to the place of work, or whether it was merely an incident of the operation of moving the tin from the cars into the building. It can of course be said that, in as much as it was necessary for the door to be kept closed when not in use, Puckett's acts in opening and closing it relieved the men who were trucking the tin from using a portion of their time in so doing, and thereby

furthered the work in which they were engaged. But even when so viewed, we are not persuaded that the opening and closing door was not first and primarily a constituent element of the environment in which the men were required to work. The door itself was a physical part of 'the place in which to work.' The sole purpose of opening and closing it was to make the place safe and suitable for the different operations being carried on in it. If the door had been equipped with an automatic device which would have opened or closed it upon the pushing of an electric button, such device would unquestionably have been regarded as a constituent of the place of work. The fact that an animate instead of an inanimate instrumentality was urged for that purpose, does not, we think, warrant a different conclusion."

This is very pertinent on the question of the relation of an animate body to and toward both a reasonably safe place in which to work, and a reasonably safe instrumentality with which to do the work. The exact doctrine was first announced in this State in the case of McCready v. Stepp, 104 Mo. App. l. c. 343, whereat REYBURN, J., said:

"It was the duty of Stepp, as master, to furnish for the use of his servants, while in course of his employment, appliances and instruments proper, safe and suitable for the purposes for which they were furnished and for the performance of the services required; and this rule extends to and embraces instruments and appliances, animate as well as inanimate. [McGarry v. Railroad, 18 N. Y. Supp. 195; Knickerbocker Co. v. Finn, 80 Fed. 483; Leigh v. Railroad, 54 N. W. 134; Hammond v. Johnson, 56 N. W. 967; Labatt, Master & Servant, sec. 206.]"

If once it be settled that a team of mules, or horses, or other animals, constitute an instrumentality placed in the hands of the servant by the master for doing of the master's work, then there are scores of cases in this court and elsewhere that fix the master's duty in reference to such an instrumentality. It is discussed in Williams v. Pryor, supra. He cannot delegate this duty, and if he does, as is frequently done by leaving it to a foreman, the master is responsible for the action of such foreman, and notice to the foreman is notice to the master.

In the McCready case, supra, WHITE, J. (now on this court), was of counsel for plaintiff, and succeeded in having the Court of Appeals declare that the same rule as to instrumentalities applied to animate instrumentalities as to inanimate instrumentalities. Judge GOODE, later an esteemed member of this court, was on the Court of Appeals when the doctrine was announced. It will be noted that the St. Louis Court of Appeals, as then constituted, was REYBURN, BLAND and GOODE, JJ., and they cited and approved Section 206 of Labatt on Master and Servant. The material portion of this section reads:

"It is well settled that a servant may recover for injuries caused by an animal which the master uses as a part of his industrial appliances, or keeps on the premises for other purposes, if it is vicious, *or in some other way dangerous to persons doing work by its agency,* or in its neighborhood, and the master was, *or ought to have been,* aware of its bad qualities.

"Wherever the animal is used as an industrial appliance, the necessity of proving the master's knowledge may be regarded as being simply an application of the general principle discussed in Chapter X. But in other instances the requirement may be viewed *either from this standpoint,* or with reference to the old rule of the common law that the *scienter* of the owner of a vicious or mischievous animal is the gist of an action against him for any injuries which it may inflict upon persons or property."

This Section 206 of the first Edition of Labatt, is Section 1109, vol. 3, page 2917, of the second edition of Labatt. Note that viciousness is not the sole element necessary to form the basis of an action by the servant against the master. The italics, supra, are ours, and serve to stress this point. Less dangerous propensities may form the basis of the action. This McCready case was cited with approval by CAULFIELD, J., in Stutzke v. Ice & Fuel Co., 156 Mo. App. l. c. 11, and by the same court in Cowan v. Hydraulic Press Brick Co., 222 S. W. l. c. 926, whereat BIGGS, C., speaking for an undivided court, said:

"The duty of the master is well settled, and that is to use ordinary care to furnish the plaintiff a reasonably safe and suitable team for the purpose for which they were to be used. And in measuring the duty the age and experience of plaintiff must be considered, for it may be negligence to furnish a sixteen-year-old boy with a team to work when to furnish the same team to a grown man would not constitute negligence. [McCready v. Stepp, 104 Mo. App. 340, 78 S. W. 671; Stutzke v. Ice & Fuel Co., 156 Mo. App. 1, 136 S. W. 243.]"

In the more recent case of Williams v. Pevely Dairy Co., 285 S. W. 149, one of the alleged grounds of negligence was:

"Defendant's negligence is alleged as a failure to exercise ordinary care to furnish plaintiff with a reasonably safe place in which to work, or with a reasonably safe mule at and near which to work; that the mule had *mean propensities and was not reasonably safe.*"

For the whole court, as then constituted, DAUES, P. J., at page 150, said:

"We must keep in mind at the outset that on the question of the *non-delegable* duty to use ordinary care to furnish a servant with reasonably safe instruments and appliances this *embraces animate* as well as inanimate things. [McCready v. Stepp, 104 Mo. App. 340,

78 S. W. 671; Stutzke v. Ice & Fuel Co., 156 Mo. App. 1, 136 S. W. 243.]''

Once the status of an animate object is fixed as constituting a part and parcel of an instrumentality with which the servant is to work, or as constituting an instrumentality with which the servant is to do the master's work, then, as said, supra, the cases are numerous fixing the exact duties of the master.

The United States Circuit Court of Appeals for the 8th Circuit (Hook and Smith, Circuit Judges, and Amidon, District Judge) had up the question in a St. Louis case in 1913, Nooney v. Pacific Express Co., 208 Fed. 274. The driver of an express wagon was injured by an unbroken country horse, which becoming frightened, reared up, and as he came down kicked the driver. The practically unbroken horse became frightened at an approaching street car. AMIDON, J., for the court said:

''Defendant contends that this case falls within the ancient rule of the common law that in order to make a master liable for injury, caused by the vicious conduct of a domestic animal, the master must have known of the vicious character of the animal—that every horse is entitled to one kick; the same as every dog is entitled to one bite. The rule had its origin in an agricultural community long before domestic animals were subjected to the contrasts between the quietness of the country and the terrors of a modern-city street. It has not for years been looked upon with favor, and we do not think that it should be applied in any field outside of that which is covered by authority. If it were necessary to apply the rule in this case we think there was sufficient evidence to show *scienter*. The cause of injury was not that the horse was 'possessed of an evil propensity' and accustomed to attack and injure mankind,' according to the formula of the old common law. On the contrary, the conduct of the horse was due to the fact that it had been taken from the quietness of the country and plunged into the terrifying environment of a great city, without proper training, and of the effect of this change upon the horse defendant had abundant knowledge. *The case, however, properly falls within a more recent, as well as a more just, rule.* The master is required to furnish his servant with reasonably safe instrumentalities with which to perform his services. *Here the horse was such an instrumentality in precisely the same sense as the wagon.* The duty of the master was to exercise reasonable care to furnish the plaintiff with 'a reasonably safe horse for the performance of his service; and the whole question is, Was there evidence which made a case that ought to have been sent to the jury to decide whether or not what the defendant did with respect to this horse constituted the exercise of reasonable care? The evidence showed that the horse was a green, country animal, wholly inex-

perienced in regard to the city. The defendant was bound to know the effect of exposing such a horse to the cars and automobiles of city streets. If such a horse had been given to the plaintiff without any previous testing of its behavior in the city, all would agree that such conduct would have been negligent. The defendant did not do this, but it did place him in charge of a horse which had not been properly broken for single driving; at least, the evidence was sufficient to carry that question to the jury. It was not necessary that defendant should have known that the horse would be guilty of the particular misconduct which resulted in plaintiff's injury. Defendant was bound to know that a green horse, under such circumstances, was likely to do some act which would cause injury to the driver, and among the acts which it had reasonable cause to anticipate was that such a horse, if sufficiently maddened with fright, would kick. We think the jury would have been justified in finding, under the evidence, that the horse had not been properly tried out and broken to city life in the two days' experience with the double wagon, and that the master was not in the exercise of reasonable care when it turned the horse over to the plaintiff for use upon a single wagon. The court, therefore, erred when it disposed of the issue as a question of law.''

The trial, or district judge, under the old rule requiring knowledge of a vicious disposition toward man, had decided that plaintiff had no case.

The question was up in England shortly after the adoption of the Employers' Liability Act, of 1880, in the case of Yarmouth v. France, 19 L. R. Queens Bench Division, 647. On the question of interest here, at page 651, Lord ESHER, M. R., said:

''Then comes the question which is somewhat more difficult—can a horse be considered 'plant' within s.1, sub-s. 1, of the Employers' Liability Act? It is suggested that nothing that is animate can be plant; that is, that living creatures can in no sense be considered plant. Why not? In many businesses horses and carts, wagons, or drays, seem to me to form the most material part of the plant: they are the materials or instruments which the employer must use for the purpose of carrying on his business, and without which he could not carry it on at all. The principal part of the business of a wharfinger is conveying goods from the wharf to the houses or shops or warehouses of the consignees; and for this purpose he must use horses and carts or wagons. They are all necessary for the carrying on of the business. It cannot for a moment be contended that the carts and wagons are not 'plant.' Can it be said that the horses, without which the carts and wagons would be useless, are not? If, then, this horse was part of the plant, it had a defect, that is, it had the constant habit, whether in a stable or harnessed to a trolley, of kicking what-

ever was near it, whether a human being or a brick wall. In short, it was a vicious beast that could not be managed or controlled by the most careful driver. The plant, therefore, was defective.''

In this case, this doctrine, i. e. that the horse constituted a part of the plant, had the approval of a majority of the court. In this regard it accords with the views of RAGLAND, J., in Johnson v. Corn Products Company, supra, wherein he concluded that an elevator operator might, under given circumstances, constitute a part of a working place.

That animals may constitute an instrumentality furnished by the master to the servant for the performance of the master's work, and in law occupy the same status as inanimate instrumentalities, has been frequently ruled in other states. That is to say, that such animals so furnished, like inanimate tools, instruments or instrumentalities, must be reasonably safe for the performance of the work required to be performed by the servant. Thus in Miller v. Blood, 217 N. Y. l. c. 519, it is said:

''The plaintiff was not injured through the keeping by the company of a vicious horse and its acts directly upon him. The action is not within the class arising from injuries done by domestic animals which are vicious and which are known by their owners or keepers to be vicious. [Muller v. McKesson, 73 N. Y. 195; Lynch v. McNally, 73 N. Y. 347; Worthen v. Love, 60 Vt. 285; Earbart v. Youngblood, 27 Pa. St. 331.]

''The company, as the employer, was under the duty to *furnish instrumentalities and appliances reasonably safe and suitable for the authorized use to be made of them by the plaintiff as the employee.* The duty related and was applicable to the horses, as well as to the harness and truck and the appliances connected with it. [Nooney v. Pacific Express Co., 208 Fed. 274; Yarmouth v. France, 19 Q. B. D. 647; Hammon Co. v. Johnson, 38 Neb. 244; Knickerbocker Ice Co. v. Finn, 80 Fed. 483; Simonds v. Interstate Lumber Co., 215 Mass. 263.] Failure on the part of the company to fulfill such obligation constituted negligence, and actionable negligence in case it caused or contributed to the injuries received and those injuries were reasonably apprehensible. The evidence tended to show actionable negligence on the part of the company.''

The italics are ours. On facts this case is much like the case at bar. The habit or propensity did not rise to viciousness toward man.

In the rather recent case of Manufacturers' Fuel Co. v. White, 228 Ill. l. c. 191, that court said:

''Instructions given did not require that the jury find, as a necessary element of plaintiff's cause of action, that the animal had a vicious and dangerous propensity to kick mankind, and it is urged that a propensity to kick, which was merely an evidence of ill-temper

and not the result of a desire to injure a human being, is not sufficient to establish the liability of the master, the owner of the animal, even where he has knowledge of its propensity and where the servant injured has no such knowledge and is not chargeable with such knowledge. A number of authorities have been cited by appellant in support of its position in this regard, but we find, upon examination, that the doctrine upon which it relies has not been announced or held applicable, in any case to which we have been referred, *where a servant has been directed to use the animal in question in the performance of the duties of the employment.* On reason we are unable to perceive any distinction between *directing the use of an animal that is dangerous on account of its peculiar inclination to kick under certain circumstances,* even though its efforts in that regard be not particularly directed against mankind, and *directing the use of an instrumentality or appliance of a mechanical nature* which is dangerous to the servant.''

So too in a case where the servant was given an unbroken horse with which to perform his work, and was injured thereby, the Supreme Court of Nebraska, in Hammond v. Johnson, 38 Neb. 1. c. 250, said:

''There was an attempt to apply in argument the rule deducible from certain cases wherein the liability was sought to be fixed by reason of injuries suffered by strangers from the bites of dogs and kicks of horses. Such cases, however, are not governed by the same rule or reason at the case at bar, for the owner in such cases was not instrumental in placing the injured party in danger, and was therefore held liable only for such knowledge of the evil propensity of the animal complained of as he actually possessed. In the class of cases under consideration, however, the servant is not a mere volunteer. He is required by his master to assume the danger which the existence of vicious and uncurbed propensities implies, and if the master could, by the exercise of reasonable care, know of the existence of such propensities, his actual ignorance of them is no excuse in law.''

The first syllabi to this opinion fairly presents the court's ruling and reads thus:

''It is the duty of a master to furnish for the use of his servant in the course of his employment, proper and safe appliances and instruments for the performance of the services required. And if the master fail so to do, he is liable for such damages as are the direct result of negligence, unless the servant himself is guilty of such negligence as contributes directly to the injury; and this rule applies irrespective of whether the appliances and instruments so furnished were animate or inanimate.''

In another Nebraska case, Leigh v. Omaha St. Ry. Co., 54 N. W. 1. c. 134, MAXWELL, C. J., said:

"The testimony clearly shows the relation of the employee and employer between Leigh and the defendant. This being so, it is a fundamental rule of law that the master is to furnish his servant with such appliances for his work as are suitable, and may be used with safety, and, if the servant is injured by reason of defective appliances placed in his hands by the master or his agent, the master will be liable, unless he can clearly show that he has used due care in the selection of the same. [Weems v. Mathieson, 4 Macq. 215; Feltham v. England, L. R. 2 Q. B. 33; Warner v. Railroad Co., 39 N. Y. 468; Hough v. Railway Co., 100 U. S. 213; Railway Co. v. McDaniels, 107 U. S. 454-459; Railroad Co. v. Swett, 45 Ill. 202; Noyes v. Smith, 28 Vt. 59; Northcoate v. Bechelder, 111 Mass. 322; Manufacturing Co. v. Ballou, 71 Ill. 418; Kranz v. White, 8 Ill. App. 583.] Now here was an animal which would kick on being struck, and the owner knew it, yet he delivered it to Leigh on the street car, to drive, without informing him of the fault. It is the duty of such driver to stand on the front platform, close to the horses. In effect, a defective, and under some circumstances a dangerous, appliance in the propelling power of the car was used. *The fact that it was an animal instead of a steam engine can make no difference.* It was the duty of the defendant to furnish the deceased *with a safe team,* or inform him of its bad or vicious habits, so that he could guard against them."

The case clearly emphasizes the fact that in cases of master and servant an animal should be classed as an instrumentality as much as a steam engine or other inanimate instrumentalities.

In the case of Central Lumber Co. v. Porter, 103 So. 1. c. 508, the Supreme Court of Mississippi, said:

"It is next insisted that negligence cannot be predicated on the character of the work animals short of viciousness; that the proof does not show that the animal involved here was vicious. Without entering into any definition of 'viciousness,' we think that this court had laid down the rule that, where a master has knowledge that an animal is unsafe and dangerous, and furnishes such an animal to a servant for use in the master's service, in case of injuries to the servant, from such unsafe animal, the master is liable."

The court then quotes with approval what we have quoted, supra, from the case of Miller v. Blood, 217 N. Y. 1. c. 519, and also cites with approval Cowan v. Hydraulic Press Brick Co. (Mo. App.), 222 S. W. 924.

In Arkansas Smokeless Coal Co. v. Pippen, 92 Ark. 1. c. 141, HART, J., for the Supreme Court of Arkansas, said:

"Counsel for appellant insists that the court erred in not directing a verdict in favor of appellant. The law in regard to the negligence of the master in furnishing his servant with a vicious animal to

work stands on the same footing as furnishing him a dangerous appliance.''

Other cases recognizing that an animal furnished to the servant for the performance of the work of the master, is as much of an instrumentality as an inanimate tool, appliance or instrumentality, could be cited and reviewed, but those we have quoted from above show the general trend of the cases, wherever the exact question has been discussed. By the exact question we mean that, in a case of *master and servant,* the furnishing of a horse, mule, ox or other animal to the servant for the doing of the master's work stands upon exactly the same basis as the furnishing of inanimate tools, appliances and instrumentalities, and the master's duties and legal obligations are exactly the same in both instances. The duty is nondelegable and continuous in each instance. The case law elsewhere accords with what our St. Louis Court of Appeals has several times ruled, i. e. that it is the duty of the master ''to furnish for the use of his servants, while in the course of his employment, appliances and instruments, proper, safe and suitable for the purpose for which they were furnished and for the performance of the services required; and this rule extends to and embraces instruments and appliances, *animate* as well as inanimate.''

On principle there can be no distinction between the furnishing of a defective and unsuitable tool or appliance (inanimate objects), and in furnishing a horse, mule, ox, or other animal, possessed of habits, traits of character, or other propensities, which renders such animal not reasonably safe for use in doing the work required to be done by the servant for the master. We think the status of the animate instrumentality (the animal) is exactly the same as inanimate instrumentalities, and that the rule of law, applicable to master and servant, is and should be the same as to both kinds of instrumentalities. With the status of animate instrumentalities thus fixed, the applicable law of Missouri is well settled by numerous cases from this court. Of these rules of law next.

III. The cases cited and discussed, supra, all go to the single question that an animal is as much an instrumentality as a mechanical appliance, and when given to a servant for the performance of the master's work the master is under the same duty as he is with reference to mechanical (inanimate) appliances. With this status fixed, many cases from this court measure and fix the master's obligations and duties. The cases which deal with the old common-law rule as to the obligations of the owner of vicious animals to persons not servants, and not using such animal as an instrumentality furnished by the master to the servant for the performance of the master's business, must be left out of

consideration. In cases much is said about the servant assuming the risk, if he is advised of and knows of the vicious or dangerous habits of the animal, and continues to use him. Such cases will have to be left out of consideration because no such doctrine of assumption of risk prevails in Missouri when the master has been negligent in furnishing instrumentalities which are not reasonably safe for the performance of the work of the master. In Missouri the servant never assumes a risk which is occasioned by the negligence of the master. [Williams v. Pryor, 272 Mo. l. c. 621; Fish v. Railway, 263 Mo. l. c. 125; Charlton v. Railroad, 200 Mo. l. c. 433; Patrum v. Railroad, 259 Mo. l. c. 123; George v. Railroad, 225 Mo. l. c. 407.] If the master fails to furnish the servant with a reasonably safe instrumentality with which to do the master's work, then the master is guilty of actionable negligence. In the Williams case, supra, 272 Mo. l. c. 620, we outlined the master's duties thus:

"We start with the rule, that where one employs another to do a given work (thus creating the relationship of master and servant) the latter (the servant) assumes the ordinary and usual risks incident to such employment. We then advance to another simple and well-defined rule, that it is the duty of the employer to furnish to the employee a reasonably safe place within which to perform the work, and reasonably safe tools with which to perform it. These duties are what we denominate non-delegable duties. They rest upon the master, and if he leaves those duties to be performed by another, he is responsible for the performance. In other words, the master can never shift liability by saying that he had a competent person do these things for him. They are non-delegable duties in the sense that the master is always responsible for the faithful performance of them."

In the same case (272 Mo. l. c. 621) we state the Missouri rule as to assumption of risk occasioned by the negligence of the master, thus: "It is the unbroken rule in Missouri, that the servant never assumes the risk, where such risk grows out of the negligence of the master. [Fish v. Railway, 263 Mo. l. c. 125; Charlton v. Railroad, 200 Mo. l. c. 433; Patrum v. Railroad, 259 Mo. l. c. 124; George v. Railroad, 225 Mo. l. c. 407.] These cases and the cases cited therein thoroughly state the rule and reasons therefor."

In the Charlton case, cited, supra, 200 Mo. l. c. 433, LAMM, J., said: "Assumption of risks rests on contract—negligence rests in tort. [Dale v. Hill-O'Meara Construction Co., 108 Mo. App. l. c. 97.] The servant, when he enters his master's employ, impliedly agrees with him, for the compensation named, to assume the risk of usual dangers incident to the work. But the servant does not assume the risk of the master's negligence, for a very good reason, and that is, because it is a fundamental proposition that it is against public policy for a master

to contract against his own negligence. So, too, in the assumption of risk by a servant it is well to consider a certain assumption by the master, and that is, that the master impliedly contracts with the servant that he will exercise ordinary care to protect such servant from injury by providing a reasonably safe place for him to work. When these two assumptions are considered as proceeding hand in hand, it will be perceived that the risks assumed by the servant are those risks alone which remain after the master has exercised ordinary care."

See also the many cases cited by Judge LAMM in Charlton's case. Of the Missouri rule there can be no question. We dispose of the matter on the doctrine of contributory negligence. See Patrum v. Railroad, 259 Mo. l. c. 120, whereat FARIS, J., said:

"Under the doctrine found in the Missouri cases dealing with so-called assumption of risk the employee 'does not assume the negligence of the master or that of a vice-principal.' The moment negligence comes in at the door it may well be said that the doctrine of assumption of risk goes out at the window. [Curtis v. McNair, 173 Mo. 270; Brady v. Railroad, 206 Mo. 509; Tinkle v. Railroad, 212 Mo. 445; Huston v. Railroad, 129 Mo. App. 576.] We have here in Missouri, whether logically or illogically we need not here pause to discuss, come to use the term 'assumption of risk' to express the mere hazard which appertain to a dangerous avocation when unaffected by the negligence of the master. When, however, the servant entered into or remains in the service of the master with actual or constructive knowledge of defects arising from the master's negligence and without a promise of remedy, we speak of this in our Missouri courts as contributory negligence."

For the servant to be guilty of contributory negligence by remaining in the service, after notice of the master's negligence and the risk created thereby, the risk must be so obviously and glaringly dangerous that a prudent person in the exercise of ordinary care for his own protection would not encounter such risk by remaining in the service. This because, in one sense, contributory negligence is but the failure to exercise ordinary care to protect the person from danger. If it can be said that a reasonably prudent person would not quit his service because of the added risk, then such servant is not guilty of contributory negligence. Such is the Missouri rule. So all those cases which speak of the servant assuming the risk must be left out of the consideration. There are many jurisdictions that rule, as the Federal courts announce the doctrine of assumption of risk in cases under the Federal Employer's Liability Act, i. e. that if the servant knows of and fully appreciates the risk and danger created by the master's negligence, and continues in the service, then such risk is assumed by the servant. We are making no attempt here to state with exactness the Federal rule, and the construction of the common

law by the Federal courts. However, the doctrine announced in the Williams case is the Missouri rule, and governs all Missouri cases wherein the action is not founded upon a Federal statute. The Missouri rule applies to this instant case, and all other purely Missouri cases. This Missouri rule we also carefully stated in the Williams case, supra, 272 Mo. 1. c. 622, thus:

"In Fish v. Railway, 263 Mo. 106, we properly held that under the Federal statutes there were two classes of cases: (1) a class of cases wherein the assumption of risk could not be invoked, and (2) a class of cases wherein the defendant could invoke the doctrine of assumed risk. With this ruling we are fully satisfied, and the case now before us is within the latter class, above named. But in the Fish case, supra, we further held that as to the class of cases wherein the doctrine of assumed risk could be invoked, such assumed risk must be determined by the common-law rule, and to this doctrine we now adhere. Not only so, but we say now, in plain terms, what was inferentially said in the Fish case, and that is, by the common-law rule, we mean the rule of the common law as it had been announced by the Missouri courts. That rule is that the servant never assumes a risk where such risk is the outgrowth of the master's negligent act. In Missouri, the use of a glaringly defective tool may show negligence upon the part of the party so using it, but such party does not assume the risk which was created by the negligent act of the master in furnishing such tool. In such cases we hold that the plaintiff cannot recover on the ground of his own negligence, i. e. his doing a thing which an ordinarily careful and prudent man would not have done, having in view his own safety. In the Fish case, supra, we denominated this contributory negligence, and we still adhere to that rule. The Fish case is not the only Missouri case so to announce, but on the contrary many cases so hold. If assumption of risk grows out of the contractual relation of master and servant, as our cases hold, then there is no other field in which to place such acts of the servant, than the field of contributory negligence. The risks he assumes are those he contracted to assume, i. e., those necessarily incident to the work. Not risks which grow out of negligence, whether such negligence comes from the one contracting party or from the other. If the neglect is that of the master, we simply denominate it negligence. If the neglect is that of the servant, and he is suing for the neglect of the master, we denominate it contributory negligence. To illustrate by the case at bar. It was the duty of the master to furnish the servant a reasonably safe clawbar with which to do the work. The failure to furnish that character of a clawbar was negligence upon the part of the master. If the defects were so glaring, and the clawbar so patently defective that an ordinarily prudent servant would not have used it, then its use under such circumstances was

negligence upon the part of the servant, which negligence under the rule in Missouri would bar him from a recovery.''

. Hence the doctrine of assumption of risk is not in the case. The servant does not assume the risk created by the negligence of the master. Thus all that line of cases is and must be eliminated.

So in Missouri, the failure of the master to furnish the servant with a reasonably safe instrumentality, with which to do the master's work (whether such instrumentality be animate or inanimate), is negligence. So also is the master's failure to use ordinary care to furnish such reasonably safe instrumentalities, negligence. This risk (created by such negligence), the servant never assumes, and his action can only be defeated by his contributory negligence. And there is not even contributory negligence, unless the defects are so glaring that an ordinarily prudent person would not have used the instrumentality.

But in the case at bar contributory negligence on the part of deceased is not pleaded, nor is it urged in the briefs, or the assignment of error.

IV. Under our rule in Missouri the petition in this case stated a good cause of action, and the proof thereunder made for the plaintiff a case for the jury, and the jury's finding is conclusive here, absent procedural error. Both the wife and the witness John Allen testified to facts from which the jury could find the negligence of the master in furnishing this team to deceased. Allen says he had known the team for five or six years, and saw it jerk forward when they would be loading the wagon at the factory of the defendant. That he saw this many times, and saw it when defendant's foreman was present and looking. The wife's evidence goes further and shows complaint and demand for another team two weeks prior to the accident. The master therefore knew the propensities of these mules. We conclude that the petition stated a case for plaintiff; and the proof under the petition was such as authorizes the submission of the case to the jury.

. V. The last complaint made is, that under Assignment 3 of the assignment of errors, the court erred in admitting certain irrelevant, incompetent and prejudicial evidence during the cross-examination of defendant's witness, O. C. Belleville. This occurred on the cross-examination. The complaint is lodged more particularly against that portion of the cross-examination where counsel for plaintiff asked the witness the following questions:

"Q. Didn't you tell me that you made your statement to the insurance company?

"MR. RENARD: I object to that, if the Court please; I object to it and asked that the jury be discharged, as highly prejudicial and brought out by the plaintiff's own counsel.

"THE COURT: Well, he will have to follow it up by taking the stand, then.

"MR. EAGLETON: Yes; I will take the stand.

"THE COURT: If he doesn't, it will be stricken out; it will be overruled at this time.

"MR. EAGLETON: Q. Didn't you say that? A. I don't remember just exactly the words, Mr. Eagleton.

"Q. You never mentioned Waechter's name, did you? A. No, I don't believe I did.

"Q. You didn't even know his name? A. I mentioned at the office at the Oriel Glass Company.

"Q. Well, that is who he told you he was when he came up, didn't he? A. Up here?

"Q. Up to the Oriel Glass Company? A. Yes, sir.

"Q. That he was from the insurance company? A. No, sir.

"MR. RENARD: Now, if the Court please, I object to that; there is no evidence in this case that it was an insurance company.

"MR. EAGLETON: There never will be until we produce it.

"THE COURT: Do you intend to produce it?

"MR. EAGLETON: Yes; I will put you on the stand, if necessary, to prove it.

"MR. RENARD: That is highly prejudicial.

"THE COURT: Do you intend to take the witness stand to testify what your conversation with this witness was?

"MR. EAGLETON: Yes.

"THE COURT: Overruled.

"To which action and ruling of the court defendant, by counsel, then and there duly objected and excepted and still continues to object and except.

"MR. EAGLETON: Q. Didn't you say that—didn't he tell you that? A. He didn't tell me anything; I don't recall whether it was him at the office or not, but the fellow that came for that, who made the report, it was the insurance company man."

Now to get the situation. The evening before the trial of this case Mr. Eagleton called up the witness on the phone. Mr. Eagleton testified as to what the witness told him over the phone. The trial court admitted this evidence, as seen by the above, on condition that Mr. Eagleton would testify, and he did testify, and appellant has made a short outline of his evidence in chief thus:

"Mr. Eagleton: My name is Mark D. Eagleton, and I am the attorney for the plaintiff in this case. On yesterday evening, about ten minutes after five, I called, or had the girl call, the Vandeventer Lumber Company, at which place I understood Mr. Belleville was employed, having obtained his name yesterday, as a probable witness in the case. I called on the telephone and Mr. Belleville answered the phone, and I told him that I was the attorney who was going to try the case, in the case of Warner versus Oriel Glass Company, which was set for trial—I said 'Tomorrow,' which would be today; the conversation was had yesterday. I told him that his name had been given to me as a witness and I wanted to know what he knew about the matter. Belleville replied that all he knew about the matter was contained in a deposition which he made to the insurance company. I then told him all I wanted to know he could answer in two questions, which were, first, whether or not he saw the accident; and, secondly, whether he was in or outside the building, and he said he wouldn't commit himself and say he did or did not see it or was in or outside of the building until he refreshed his recollection by going to the insurance company's office and reading the deposition. He then said he would go to the insurance company's office this morning and read the deposition and come to my office, but he never asked me where my office was, nor did he ask me to repeat my name, because I informed him I couldn't get the deposition, inasmuch as I was the attorney for the plaintiff and not any insurance company. This morning, about nine o'clock, Mr. Zunz—some one from the Oriel Glass Company—I assume it was him, because he called, said Mr. Belleville is unable to keep that appointment with you because he was suddenly called to South St. Louis, to make a trip. That is all of it."

Counsel for appellant cross-examined Mr. Eagleton, and in such cross-examination brought out fully the fact that on the day before the trial, and prior thereto, the appellant, through those in charge of its office, declined to give out any information until the insurance company could be consulted. The very thing objected to when Belleville was on the witness stand, was thus voluntarily proven by counsel for appellant by Eagleton.

But this is not all. Belleville claims to have seen the accident. In this claim he is flatly contradicted by John Allen, who testified for plaintiff. Allen said that there was no one in this alley at the time of the accident, except himself, Warner and the mules and wagon. Allen identified Belleville at the trial, and said that he (Allen) went to the rear of the wagon to where Warner was lying, and after he got there, Belleville jumped out from the inside of the box factory at the rear of the wagon. Note further that Belleville had testified that he saw the accident, and that Warner had fallen from the inside of the building—two feet back from the sill of the doorway.

He also testified that he had known these mules for two or two and a half years, and saw them on an average of once a week, and that he never saw them start without warning, and had never observed that they were restless or nervous. He said also:

"Q. You don't know of your own knowledge what caused the wagon to move or the team to move on the occasion of the accident? A. I *have some idea of why that thing happened there.*

"MR. EAGLETON: We want what you know.

"MR. RENARD: Q. *But you don't know of your own knowledge?* A. *No; I don't.*"

He was what is sometimes called a star witness for the defendant, and his reluctancy to give out, in advance, the facts, of his knowledge, clearly appears from the evidence of Mr. Eagleton. This cross-examination was proper for the purpose of a foundation for impeaching or discrediting this witness. It shows clearly the bias, prejudice and interest of the witness, and was proper for that purpose. If it chanced to show that an insurance company was back of the defense, such does not effect its competency. There seems to be but little question that an insurance company was actually in the defense of the case, but be that as it may, there was no error in the cross-examination of Belleville as to all that was said between him and Eagleton over the phone. He had even promised to see Eagleton the next morning, and admits that he did not keep that engagement. There is no reversible error in the court's action in this regard.

What we have said covers all the assignments of error. From it all we conclude that this judgment should be affirmed. It is so ordered. All concur.