**ACKER et al. v. UNITED STATES et al.**
No. 13829.

District Court, N. D. Illinois, E. D.
Dec. 31, 1934, and Feb. 1, 1935.

George I. Haight, John S. Boyd, and M. K. Hobbs, all of Chicago, Ill., for plaintiffs.

Wendell Berge, Sp. Asst. to the Atty. Gen., and John Dickinson, Asst. Atty. Gen., for defendants.

Before ALSCHULER, Circuit Judge, and WILKERSON and BARNES, District Judges.

BARNES, District Judge.

This is a suit by 157 persons, partnerships, and corporations who are registered and doing business under the Packers and Stockyards Act 1921 (USCA title 7, c. 9, § 181 et seq.) as market agencies engaged in the buying and selling in commerce of livestock on a commission basis at the Union Stock Yards, Chicago, Ill., against the United States, Henry A. Wallace, Secretary of Agriculture, Homer S. Cummings, Attorney General, and Dwight H. Green, United States District Attorney for the Northern District of Illinois, to restrain the execution and enforcement of an order of the Secretary of Agriculture of January 8, 1934, and a supplemental order of the Secretary dated March 12, 1934.

Since 1865, there has existed in Chicago stockyards, commonly known as Chicago Union Stock Yards, to which producers and shippers of livestock send cattle, hogs, sheep, goats, mules, and horses for sale. It is the primary market for the chief livestock producing sections of the United States. It is regarded by the livestock industry as the basic market for livestock in the United States, if not for the world. The prices prevailing at this market establish and affect the price of livestock throughout the United States and the world. Shippers to this market reside in and ship from 45 states of the Union.

After the enactment of the Packers and Stockyards Act, 1921, the Chicago Live Stock Exchange (a trade association whose members comprise commission merchants and other market agencies), and all market agencies, members thereof, including some or all of the plaintiffs, agreed with the then Secretary of Agriculture that, in lieu of the formal procedure and hearing provided for by said act, the entire subject-matter and charges in a certain complaint by American National Live Stock Association and others against the Chicago Live Stock Exchange and others might be investigated by two arbitrators, with full authority in said arbitrators finally to adjust and determine the issues raised in said complaint. It was further agreed that the rates and charges and practices found to be just and reasonable by said arbitrators and recommended by them would be adopted by the Chicago Live Stock Exchange and the members thereof upon approval by the Secretary of Agriculture. Pursuant to said arbitration agreement, and after hearing, a schedule of rates

and charges and practices was prescribed by said arbitrators, approved by the then Secretary of Agriculture, and adopted by the Chicago Live Stock Exchange and the members thereof. Said schedule of rates, charges, and practices, without substantial alteration, has been in effect since September 15, 1923, and the plaintiffs and others similarly situated have, since that date, adopted and followed and used the said schedule.

On September 23, 1932, the acting Secretary of Agriculture entered an order of inquiry and notice of hearing against the plaintiffs and others wherein it was directed that an inquiry be made for the purpose of determining the lawfulness of any and all rates and charges of the plaintiffs and of any rules, regulation, or practice affecting the same, or the rendering of any stockyard service without making any charge therefor. A hearing was subsequently held beginning on May 15, 1933, before an examiner acting under and by the authority of the Secretary. Said hearing was finally adjourned on November 7, 1933. Oral argument was had on December 13, 1933, before the Secretary.

On January 8, 1934, the Secretary executed and issued his order which is by this action sought to be enjoined. By said order a schedule of rates, charges, and classifications was prescribed, and it was ordered that they should become effective 30 days thereafter.

On February 7, 1934, the plaintiffs filed a petition for rehearing, which was denied on March 12, 1934. By the same order denying the petition for rehearing, the schedule of rates, charges, and classifications of the order of January 8, 1934, was slightly modified. The extent to which the prescribed rates will reduce prior rates is in dispute. Plaintiffs contend that the prescribed rates, when applied to the four months' period ending April 30, 1934, will effect an average reduction in gross commissions of 20.68 per cent. By orders entered from time to time, the Secretary postponed the effective date of the order of January 8, 1934, and the supplemental order issued March 12, 1934. The effective date lastly fixed was April 20, 1934.

On April 9, 1934, the plaintiffs and others filed an amended petition for rehearing, which was denied by the Secretary on April 12, 1934.

On April 18, 1934, the plaintiffs filed their bill of complaint in this cause, wherein they charged that the rates prescribed by the Secretary in his orders of January 8, 1934, and March 12, 1934, are unreasonable and arbitrary and are contrary to the evidence and without evidence upon which they may be based, that they were unreasonably and arbitrarily arrived at by guess and supposition rather than by any well-known and well-recognized statistical method, such as the model method, the bulk-line method, the weighted average method, or percentage deviations therefrom. The bill further charges the confiscation of property and the deprivation of business and property without due process of law.

On April 19, 1934, this court granted a preliminary injunction, restraining the enforcement of the prescribed rates. The injunction was conditioned upon plaintiffs depositing with the clerk of this court the full amount by which the charges collected under the schedule of rates in effect exceeds the amount which would have been collected for an equal period of time under the rates prescribed by orders of the Secretary of Agriculture. Subsequently, the case came on for final hearing before the court. At that time, the plaintiffs sought leave to introduce additional evidence on the subject of alleged confiscation. The right to introduce further evidence was contested by the defendants. The court permitted the testimony to be received subject to the objection in order that it might be before this court and the reviewing court, if deemed proper.

The Secretary caused to be made an investigation of the books and records of each of the market agencies doing business at the Chicago Union Stockyards. This investigation included an audit of the financial status of all firms for the years 1931 and 1932, an analysis of all income and expense, and an appraisal of all fixed assets owned by each firm. After an examination and analysis of the audits, the Secretary found reasonable per head costs and reasonable per head profits for selling each species of livestock and prescribed rates which include a substantial margin above such reasonable costs and profits.

Complaint is made that the Secretary did not use some other statistical method in determining the rates to be prescribed, such as the median method, involving the selecting the unit cost of the firm above which there are as many

firms with higher costs as there are below with lower costs, the bulk-line method, involving eliminating a certain percentage of firms from consideration, the market average method, or percentage deviations from said methods. No particular method is prescribed by Constitution or statute. The use of any one of these methods would have involved the exercise of judgment by the ratemaker on one occasion, and sometimes more—always when he chose the method and sometimes when he used it. The judgment factor cannot be excluded. The statute does not contemplate it shall be. A reasonable rate schedule is the result of the application of judgment by the ratemaker to the pertinent facts. The Secretary chose to apply his judgment to the pertinent facts according to the method shown by .the evidence and above recited. That method was open to him under the statute.

■ It is said that the Secretary has usurped the powers of a manager in that he has fixed salesmen's salaries and in that he has limited the amounts which may be spent for business getting and maintaining expenses. It is true, of course, that, subject to reasonable regulation in the public interest, the management and right to control the policy of a business affected with a public interest belong to its owners (Banton v. Belt Line R. Corporation, 268 U.S. 413, 421, 45 S.Ct. 534, 69 L.Ed. 1020), but that does not mean that the governmental agency charged with the fixing of reasonable rates may not consider and determine what are reasonable wages or salaries or other compensation for human effort to be covered into rates. If this power does not exist, the power to prescribe reasonable rates does not exist, and Congress has vested the latter power in the Secretary. Tagg Bros. & Moorhead v. United States, 280 U.S. 420, 438, 50 S.Ct. 220, 74 L.Ed. 524. In the case at bar, the Secretary has not by his orders sought directly to affect the management or business policy of the plaintiffs. They are free to pay for salesmen's salaries and for business getting and maintaining expenses such amount as to them seem wise. The Secretary has. merely determined a reasonable per head salesmanship cost and business getting and maintaining expense to be covered into rates to be charged the ratepayer.

That was within the power vested in him to prescribe reasonable rates.

■ The plaintiffs had the value of owners' services appraised by a committee of five and offered the appraisals before the Secretary. The Secretary, however, did not accept the appraisals as binding on him, but took the amounts that the owners had set up as salaries or drawing accounts for themselves, or where no amounts had been set up, he classified net profits as compensation to the owners in lieu of salary. We think the Secretary was justified in this course. The amounts which he used in determining costs were the amounts which the owners actually received. The appraisal figures were what the committee thought the owners might receive if they bargained with others for their services. Furthermore, the Secretary, in fixing the rates, allowed something to cover management and something to cover insurable risks and called the two profit.. He also allowed something for interest on investment. But, in addition to the foregoing items, the Secretary allowed a substantial spread between the total of the reasonable costs and profits and the rates as prescribed. This difference, based on the business of 1932, approximates $500,-000 for the market as a whole, or nearly 25 per cent. more than the total costs and profits found by the Secretary to be reasonable. It is unquestionably true that even under the old rates some of the commission men at Chicago experienced difficulty in earning a livelihood; but such a result will come about more or less under any rate, in any industry or occupation. There are always those whose entry into or continuance in a business cannot be justified save for the hope and expectation that their business will increase and they will become more prosperous. Of course the rate structure cannot be predicated alone upon the experience of those whose volume of business is very small. No more should it be predicated entirely upon the experience of those who are in the enjoyment of a very large business. All must be considered, and as nearly as possible a fair conclusion must be reached. It is possible that quite a number of the smallest dealers may not long survive the new rates; but probably numbers of them would not have survived under the old rate. When one enters such an occupa-

tion in the hope of eventually working up a successful business, the volume of his transactions will for a time necessarily be small, and if success comes to him, it will be because he has been able to hold on until the business reaches a volume that will afford him a livelihood. But proper rate regulation in a large industry charged with a public interest cannot, of course, be stayed because a few there are who would suffer from its application. We cannot say that the Secretary did not make an adequate allowance for the owner's function.

■ Complaint is made that the Secretary classified livestock into grades, depending upon weight, and prescribed his rates on a consignment basis rather than on a draft basis. A "draft" is all those animals in one consignment weighed as a single sales or purchase classification. A "consignment," on the other hand, is all the livestock of one species delivered in the name of one person to one market agency to be offered for sale during the trading hours of one day. It appears from the record that, at the oral argument before the Secretary, the plaintiffs submitted a tariff prepared by them for adoption by the Secretary. This proposed tariff was based upon the draft as the unit, with gradations in charges according to the number of head and the weight of the livestock in each draft. Both the tariff proposed by the plaintiffs and the one prescribed by the Secretary include the weight factor, of which plaintiffs now complain. The issue between a per head rate, based on the number of head in a consignment, and a per head rate, based upon the number of head in a draft, and the issue of few or many weight classifications, were clearly presented to the Secretary, and his conclusion was reached after a consideration of the relevant factors. This appears from the following language in the Secretary's order of January 8, 1934: "There are features of their (plaintiffs') proposed tariff which would tend to overcome some of the obsolete aspects of the existing tariff. The extensive weight classifications would tend to complexity in application. Fewer weight classifications can be made, which will render a tariff simple in its application and at the same time preserve substantial equity among the different weight groups. From all the evidence, it is reasonable to conclude that the con-

signment, as hereinafter defined, more nearly represents the work-occasioning unit than does the weight draft. Additional weight drafts in a consignment occasion some additional work, and the tariff structure hereinafter prescribed makes provision to compensate for that extra work."

We have considered above in some detail those phases of the Secretary's action which are said to result in the rates and charges specified in the orders of the Secretary being unreasonable and arbitrary and contrary to the evidence and without evidence on which they may be based, and, upon such consideration, we arrive at the conclusion that these contentions of the plaintiffs are without foundation.

■ The plaintiffs contend · that the denial by the Secretary of the two petitions for rehearing was arbitrary because such action precluded the plaintiffs from showing that the prescribed rates would be confiscatory. We cannot see why, in a rate case, the entity, whose rates are under investigation, should wait until after rates are prescribed before showing or attempting to show that the rates prescribed are confiscatory. The idea underlying such procedure is contrary to the fundamental rule that causes of action or defenses should not be split up. We cannot agree that the action of the Secretary was arbitrary.

■ At the trial before this court, the plaintiffs, in support of their contention that the maximum rates prescribed by the Secretary are confiscatory, offered evidence which, generally speaking, tends to show that past actual costs cannot be maintained under the prescribed rates. The defendants objected to this evidence, and it was received subject to the objection. This evidence, which was offered and received, does not establish confiscation, since there is no showing, either in the record made before the Secretary or before this court, as to the individual firms, that the volume of business received warrants taxing the ratepayers for the overhead incurred. Hegeman Farms Corporation v. Baldwin, 293 U.S. 163, 55 S.Ct. 7, 79 L.Ed. 259, decided Nov. 5, 1934; Ætna Ins. Co. v. Hyde, 275 U.S. 440, 48 S.Ct. 174, 72 L.Ed. 357; Beaumont, S. L. & W. R. Co. v. United States, 282 U.S. 74, 88, 51 S.Ct. 1, 75

L.Ed. 221. The plaintiffs have not sustained the burden of proof on the question of confiscation. Furthermore, the same may properly be said of the evidence offered in this case as was said of evidence relating to property valuation and depreciation reserve in Union Stock Yards Co. of Omaha v. United States (D.C.) 9 F.Supp. 864, 883:

"The testimony offered for the plaintiff tends to defeat its probative force by going too far and proving too much. Plaintiff's testimony is to the effect that its properties are worth some $15,000,000 and its net operating income derived from the rates it had fixed for itself was some $850,000, so that on the showing it would appear to have been voluntarily operating at a rate far below what it asserts to be a confiscatory rate. Likewise, it contends that it must have a reserve for depreciation, maintenance, and repairs far in excess of any reserve which it has ever set up on its own account. We think the testimony, by proving too much, overshoots the mark and must fail of the intended effect."

Having considered the new evidence offered for the first time in this court, and all the evidence offered before the Secretary, and having concluded, as we have, that there is no showing of confiscation, we find it unnecessary to determine whether the evidence offered for the first time in this court was admissible. Tagg Bros. & Moorhead v. U. S., 280 U.S. 420, 50 S.Ct. 220, 74 L.Ed. 524.

We are, contemporaneously with the filing of this memorandum, filing findings of fact and conclusions of law.

Counsel may, on notice, present a draft of a decree dismissing the bill of complaint for want of equity, and directing, accordingly, a disposition of the impounded funds.

### Findings of Fact.

The court makes findings of fact as follows:

1. The orders of the Secretary of Agriculture dated January 8, 1934, and March 12, 1934, prescribing rates, charges, and practices for plaintiffs as market agencies at the Union Stock Yards, Chicago, Ill., were made after full hearings accorded the plaintiffs, and each of them, and upon findings of fact made by the Secretary based upon the evidence taken at the hearings;

2. The findings of fact made by the Secretary of Agriculture, upon which the orders aforesaid of the Secretary are based, are supported by substantial evidence;

3. Upon an independent consideration of the evidence received by the Secretary of Agriculture, the court adopts, as its findings of fact, the findings of fact made by the Secretary and by this reference incorporates them herein; and,

4. Upon an independent consideration of the evidence received by the Secretary of Agriculture and that received by this court, the court adopts, as its findings of fact, the findings of fact made by the Secretary and by this reference incorporates them herein.

### Conclusions of Law.

The court concludes as matters of law as follows:

1. The orders of the Secretary of Agriculture, dated January 8, 1934, and March 12, 1934, prescribing rates, charges, and practices for plaintiffs as market agencies at the Union Stock Yards, Chicago, Ill., were made by the Secretary after a full hearing in all respects conforming to the requirements of the Packers and Stockyards Act, 1921;

2. The orders aforesaid are fully supported by the findings of fact made by the Secretary, and those findings are based on substantial evidence and are supported by the weight of the evidence and are not based upon any erroneous rules of law; and,

3. The rates, charges, and practices prescribed by the Secretary in the orders aforesaid are reasonable and not arbitrary, and do not take the property of plaintiffs, or any of them, without due process of law, in violation of the Fifth Amendment to the Constitution of the United States.

WILKERSON, District Judge.

I do not concur in the findings of this court which adopt in toto the findings of fact made by the Secretary of Agriculture. Some of them, particularly those relating to salesmanship costs and allowances for business getting and maintaining expenses, are, in my opinion, against the weight of evidence. However, I am not prepared to say that the findings were made without any evidence to support them. I join, therefore, in the entry of the decree dismissing the bill.