W. C. WHITE AND SABETHA WHITE, RESPONDENTS v. WABASH RAILROAD COMPANY, A CORPORATION, APPELLANT.—207 S. W. 2d 505.

Kansas City Court of Appeals. Opinion delivered December 1, 1947.

*Hunter, Chamier & Chamier* for appellant.

*William M. Stringer* for respondents.

CAVE, P. J.—Plaintiffs brought this action to recover damages sustained because of an alleged diversion of surface waters by the defendant onto and over a farm owned by the plaintiffs. Trial before the court and a jury resulted in a verdict and judgment for the plaintiffs in the sum of $500, and defendant duly perfected its appeal to this court.

The petition alleges that plaintiffs are husband and wife and are the owners of a farm of 240 acres of land in Randolph County, Missouri; that about three years prior to the bringing of this suit the defendant constructed a branch railroad from its main line, which ran north and south, and which branch line was constructed generally in a westerly direction and passes within a few feet of the north line of plaintiffs' farm. Because there is disagreement concerning the basis of liability charged and submitted, we quote the essential part of the petition as follows:

"3. In constructing the said branch line the defendant, by means of fills, cuts, ditches and culverts, did *knowingly* and *unlawfully* divert the surface waters from sixty to sixty-five acres of watershed, naturally draining east away from the said farm of the plaintiffs, and united the said extra surface waters with other surface waters naturally draining onto the said farm of the plaintiffs, and turned the united volume of said surface waters, by means of cuts, fills, ditches and culverts, onto the plaintiffs' said farm in one huge volume and stream, thereby *knowingly* and *unlawfully* causing the said large volume of said surface waters so enlarged by the said extra surface waters, to cut large ditches and gullies through and across the plaintiffs' said farm for a distance of about one-half

mile, and thereby greatly deepening and widening the draw through the said farm from four to eight feet in depth over the normal condition and from eight to twenty feet in width over conditions existing before the defendant had so turned the said waters over the said farm, * * *''. (Italics supplied).

Defendant's answer admits the construction of the branch line referred to in the petition, but specifically denies that it knowingly and unlawfully diverted the surface waters which naturally drained away from plaintiffs' farm, and made other specific denials of the allegations in the petition. The answer also alleged that it had constructed the branch line and the embankments, cuts, fills, culverts and ditches as it was *required to do by law* and in accordance with proper railroad engineering practices.

The reply was a general denial.

Defendant's only assignment of error is the action of the court in overruling its motion for a directed verdict.

Defendant is a railroad corporation owning and operating lines of railroad in Randolph County, Missouri, including a main line and a spur line in the vicinity of Jacksonville. The main line runs north from Moberly through the towns of Cairo and Jacksonville, and has been operated for many years. U. S. Highway 63 lies immediately east of the main railroad line. At a point approximately one and a half miles south of Jacksonville, an *east-west county road* crosses both the railroad and highway, and such crossing is referred to in the evidence as the ''Shiflett Crossing.'' The spur line (which is the basis of this dispute) was completed in 1943, and runs in a general westerly direction and is connected with the main line at two locations by means of a ''Y'' or wye. The east line of plaintiff's farm is about one-fourth mile west of the defendant's main line and the *east-west county road,* above referred to, is located on the north line of their said farm. A man by the name of Roebuck lived on the farm between defendant's main line and plaintiffs' farm. Immediately north of the Roebuck farm lies a field of approximately sixty acres bounded on the west by an abandoned county road, (which is an extension of the east line of plaintiffs' farm), on the east by defendant's main line railroad, and on the south by the above mentioned east-west county road. The witnesses referred to this field as the ''Samp Field'', and we will use the same designation. It is the draining of the surface waters from a portion of this field that gives rise to plaintiffs' complaint. Defendant constructed its wye westward across this field. The south leg of the wye runs northwest from the main line at a point near the *Shiflett Crossing,* and the north leg runs southwest from the main line at a point about 1,500 feet north of the Shiflett Crossing. The two legs join in the *Samp Field,* about 1,000 feet west of the main line at what is referred to as the ''west switch'', which is located about 260 feet

east and 280 feet north of the northeast corner of plaintiffs'· farm. From that point west a single spur line and right-of-way lie parallel to and immediately north of the east-west county road (which forms the north boundary of plaintiffs' farm for about one mile.)  For drainage purposes, and as required by Sec. 5222, R. S. 1939, the defendant constructed ditches along each side of the legs of the wye and along each side of the roadbed west of the "west switch." We insert a plat of the territory which will aid in making the situation plain.

The ditches along the legs of the wye drained the accumulated surface water off the *Samp Field* from east to west and discharged it through a 36-inch concrete culvert under defendant's embankment into a small *drain* or *branch* leading southward to a *wood box culvert under the east-west county road,* which branch entered the north line of plaintiffs' farm and continued south and southwest across the same until it joined with a larger stream.  Plaintiffs and their witnesses testified this draw or branch was 3 or 4 feet deep and 3 or 4 feet wide before the spur was built, and that it extended north of their farm into land lying north of the spur right-of-way.  The surface water from about 45 acres · of the land lying west of the *Samp Field* and north of plaintiffs' farm had always drained into this *branch* and continued to do so after defendant constructed its roadbed.  The controversy arises over the fact that defendant's ditches drained the surface water from the *Samp Field* to the west and joined it with the surface water from the land lying north of plaintiffs' farm, thereby increasing the flow in the *branch* to such an extent that the depth and width of the branch was greatly increased.

The evidence is to the effect that the *Samp Field* is almost level with the exception of about three acres in the southwest corner thereof which had always discharged its surface water into the aforementioned "branch."  The evidence is conflicting whether surface water from a substantial portion of the *Samp Field* naturally flowed east into an artificially constructed ditch along the east side thereof, thence south along that ditch and into a ditch or branch at or near the *Shiflett Crossing* prior to the construction of defendant's spur. Plaintiffs' witnesses testified, in effect, that as long as they had known the *Samp Field* it had been cultivated from west to east with open furrows to drain the water eastward and that the drainage, except for the three acres in the southwest corner thereof, had been to the east side of the field, then down the private or artificial ditch and out of the field at the southeast corner at the *Shiflett Crossing;* that since the construction of the spur line practically all the surface water on the *Samp Field* drained into the ditches beside the spur and then flowed westward to the branch or draw near the southwest corner of the *Samp Field,* at which point the defendant had provided an opening through its embankment which permitted

surface water to pass under the embankment and into the "branch", thence through a wooden culvert under the east-west county road where it then crossed plaintiffs' property line in the same branch or natural drain and flowed within the banks of said branch to the southwest corner of plaintiffs' farm and there emptied into a larger stream.

There was no evidence that the water had ever overflowed plaintiffs' land, or that it had collected into a large pond or pool above the spur tracks and been suddenly released on their land. Their complaint is that after the building of defendant's spur the increased volume of water flowing into the *branch* had caused it to erode and become 3 or 4 feet deeper and 10 or 12 feet wider; that before the construction of the spur the branch across plaintiffs' farm had been so improved by dams and other obstructions that it could be crossed by wagons and farm machinery at most any place, but that since the building of the spur the branch had become so enlarged that it practically divided their farm into two tracts and thereby damaged its value.

All the evidence is to the effect, and we think it is conceded, that the building of the spur line did not cause water to be discharged upon plaintiffs' land at a *new point* or in a *new channel,* and that the surface water draining onto plaintiffs' farm after the construction of the spur entered their land at the *same point* and in the *same channel* and through the *same wood box culvert* under the east-west county road as did the surface water draining thereon before the spur was built. The dispute arises over whether it was *unlawful* for the defendant to drain *more water* into the *natural drainage branch* across plaintiffs' farm than had theretofore naturally flowed into the same and is liable for the resulting damage. That is the very basis of plaintiffs' cause of action, as stated in their petition, which charges that the defendant did "*knowingly* and *unlawfully* divert the surface waters from sixty to sixty-five acres of watershed, naturally draining east away from the said farm of the plaintiffs, and united the said extra surface waters with other surface waters naturally draining onto the said farm of the plaintiffs, and turned the united volume of said surface waters by means of cuts, fills, ditches and culverts, onto the plaintiffs' said farm in one huge volume and stream, \* \* \*". There was other surface water flowing from the west and northwest into this ditch, but no complaint is made of that because plaintiffs admit that the surface water from such direction was following its natural course.

Defendant's evidence is to the effect that the natural drainage of the *Samp Field* was and is to the south and west through the branch on plaintiffs' farm, and that said branch was the closest outlet for such surface water and was the easiest outlet because the drop in elevation was the greatest through plaintiffs' farm. This evidence

was given by engineers who had made surveys and measurements and by geologists who had made observations of the territory involved. It is included in many exhibits filed in this court, but we deem it unnecessary to discuss such testimony and exhibits in detail because they merely present a conflict in the evidence and it is not within our province to weigh the evidence.

To get a clear understanding of plaintiffs' theory of liability, we quote the material part of their main instruction. It first defines surface water, and then instructs the jury *"that no person or corporation has the right to divert surface water from its natural course onto the lands of another; nor has any person or corporation the right to collect surface water into a body and discharge it in destructive quantities and flood onto the land of another.* In this regard the court instructs the jury that if you find from the preponderance of the evidence that the defendant has *wrongfully* and *unlawfully* diverted the surface water from its natural course, * * * and *wrongfully* and *unlawfully* discharged surface water so diverted, * * * or any other surface water in destructive quantities upon the farm of the plaintiffs and thereby causing injury to the plaintiffs' farm by increasing and accelerating the washing of the said farm of the plaintiffs, * * *" then the verdict shall be for the plaintiffs. (Italics supplied.) Thus it will be observed that plaintiffs hold to the theory that no person or corporation has the right to divert surface water from its natural course onto the land of another and, if he does so, such act is *wrongful* and *unlawful.* We do not understand that to be the law in this state.

It is true that doctrine was announced in the cases of McCormick v. The K. C. St. J. & C. B. R. Co., 70 Mo. 359, and Shane v. Railroad, 71 Mo. 237. In those cases it was distinctly held that "a landowner has no right, by erecting an embankment, to stop the natural flow of surface water or to divert its course so as to throw it upon the land of his neighbor. * * *" This is the "civil law doctrine" concerning the control of surface water. But both of those cases were specifically overruled *on that point* in Abbott v. The K. C. St. J. & C. B. Ry. Co., 83 Mo. 271, 285-6, and the court reaffirmed its allegiance to the doctrine of the "common law rule" concerning the control of surface water. In defining the "common law doctrine" the court quotes with approval from many prior decisions. We quote what seems to be the clearest and most concise statement of that doctrine, found at page 283: "But in the case of surface water, which is regarded as a common enemy, he is at liberty to guard against it or divert it from his premises, *provided he exercises reasonable care and prudence in accomplishing that object.* In the language of this court in a recent case, where this subject was carefully considered, the owner of the dominant or superior heritage must improve and use his own lands *in a reasonable way,* and in so doing he may

turn the course of, and protect his own land from, the surface water flowing thereon, and he will not be liable for any incidental injury occasioned to others by the changed course in which the water may naturally flow and for its increase upon the land of others. Each proprietor, in such case, is left to protect his own lands against the common enemy of all.'' (Italics supplied.)

A multitude of cases, decided by the Courts of Appeals and by the Supreme Court since that time, have reaffirmed the application of the ''common law doctrine'' with varying degrees of limitations and refinements. The latest definition we have.been able to find is given by the Supreme Court in Keener v. Sharp, 341 Mo. 1192, 111 S. W. (2d) 118, where the court said (120): The law seems to be well settled in Missouri that surface water is a common enemy which every man may ward off his land and thus throw it on an adjacent or lower owner, provided he does not, in warding it off, *unnecessarily collect it and discharge it to the damage of his neighbor.''* (Citing many Missouri cases.) See, also, Goll v. Railroad, 271 Mo. 655, 666. We have no hesitancy in saying that the ''common law doctrine'' is to be applied and followed in Missouri in determining the rights of property owners in fighting surface water. The ''civil law doctrine'' has been repudiated in this state.

But plaintiffs contend that, even under the common law doctrine, the dominant proprietor, in his fight against surface water, cannot collect the same in a large body, conduct it *by artificial means, as by a ditch,* and discharge it upon the servient estate in an increased volume. That doctrine is thoroughly established in this state *when certain facts exists.* Tucker v. Hagan, 300 S. W. 301, 303; Kiger v. Sanko, 1 S. W. 2d 218; Farrar v. Shuss, 221 Mo. App. 475, and many other cases cited in those opinions. But when those cases are analyzed they do not involve a consideration of Sec. 5222, R. S. Mo. 1939, and are not decided upon the rights and obligations which that section *gives* and *imposes* upon a *railroad company.* Those, and similar cases, are discussing and deciding a situation where the owner of the dominant estate (not a railroad company) collects surface water in an artificial ditch or pond and discharges it upon the servient estate at a point where there is not a *natural watercourse.* In other words, the dominant estate does not permit the surface water to follow the natural contour of the land and flow onto the servient estate in a multitude of places, but rather collects the same into a concentrated area and discharges it in a large volume upon the servient estate at a point where there is no natural drain on the servient estate to carry it away.

However, Sec. 5222, supra, requires the company within three months after the completion of the construction of a railroad in any county in the state, ''to cause to be constructed and maintained suitable openings across and through the right of way and roadbed of such

railroad, and *suitable ditches and drains* along each side of the road-bed of such railroad, to connect with *ditches, drains* or *water courses,* so as to afford sufficient outlet to drain and carry off the water, *including surface water,* along such railroad whenever the draining of such water has been obstructed or rendered necessary by the construction of such railroad; * * *.'' (Italics supplied.) Thus the railroad is required by statute to construct and maintain suitable *ditches* and *drains* along its tracks or right-of-way *for the very purpose of collecting surface water* and *draining it into other ditches, drains or watercourses* where it will be carried away. This is an obligation not required of other owners of a dominant estate.

In Byrne v. The Keokuk & W. Ry. Co., 47 Mo. App. 383, 388, the court held that the ''common law rule'' touching the diversion of surface water is not applicable to cases prosecuted under the statute, because the statute furnishes a different rule by which the liability of railroad companies is to be determined. In Cox v. Hannibal and St. J. R. Co., 174 Mo. 588, 74 S. W. 854, the Supreme Court, in referring to the statute, said it was an innovation upon the ''common law rule.'' In Poncot v. St. Louis, I. M. & S. Ry. Co., 161 S. W. 1190, the court said (1192): ''To the extent to which railroads are permitted and required by this statute to construct and maintain ditches and drains along its roadbed to carry surface water into other ditches, drains, or water courses, they cannot be held liable for so doing or for any damage resulting therefrom. It is not alleged that the lateral drain was constructed in a negligent manner or was not a 'suitable' one, or that it was made to drain more territory or more surface water than was necessary in complying with the statute, or that there was any other ditch, drain, or water course affording an outlet for this lateral ditch. The rule forbidding the collection of surface water into ditches and discharging it in increased volume on other lands is not applicable to this case.''

But plaintiffs say that their cause of action is not founded on the statute, but is based upon the general common law rule that a dominant proprietor may not collect surface water in ditches and discharge it upon the servient estate. We cannot agree that such general common law rule applies to the facts in this case. The evidence is undenied that the ditches constructed along the right-of-way of the defendant were of sufficient size to carry the surface water to the opening under its roadbed and that the water was drained through such opening into a *natural watercourse,* even though such was a small ''branch.'' If the defendant had collected the surface water in its ditches and discharged it upon plaintiffs' land at a point where there were no ''ditches, drains or watercourses'', then an entirely different question would be presented.

Plaintiffs' petition does not charge negligence on the part of the defendant, but merely alleges.that the defendant did "knowingly and unlawfully divert the surface waters, * * *". They cite and rely on that line of cases which are decided on the theory of the common law rule in a controversy between *parties who are not affected by the statue.* Farrar v. Shuss, supra; Kiger v. Sanko, supra; Rychlicki v. City of St. Louis, 98 Mo. 497. But those 'and similar cases are not controlling, because they do not involve the rights and obligations of a railroad company under Sec. 5222.

Plaintiffs lay considerable stress on the opinion in Grant v. Railroad, 149 Mo. App. 306. After reciting the facts in that case, the court states (313): "The statute in question has no application whatever to a case of this character." We gather from the opinion that the railroad company collected the surface water in its ditch and discharged it upon plaintiff's land *and not into another ditch, drain or watercourse,* as required by the statute. They also cite the case of McCormick v. Railroad, 57 Mo. 433. That cause of action arose before the present statute was enacted, and the decision was based upon an entirely different theory than must be applied under the statute. It is interesting to note that at page 439 the court pointed out what the railroad company should have done, in draining the surface water, so as not to be liable for damages done to the servient estate, and shortly thereafter (in 1874) the Legislature passed a statute requiring a railroad company to do the very thing the Supreme Court said should have been done in order not to be liable to the servient estate. See Laws 1874, p. 121. That statute is now our Sec. 5222, with certain amendments, which are not material here. In Benson v. Railroad, 78 Mo. 504, a suit for damages was based upon the ground that the railroad company "failed and neglected to provide and construct proper openings and waterways through the said roadbed" and thereby diverted surface water in large quantities upon plaintiff's land. There are many opinions holding that the property owner may recover for the damages done by the railroad when it fails to comply with the requirements of the statute, such as failing to provide proper openings or ditches. But those cases have no application in the instant case. Here the company did comply with the statute.

We are forced to the conclusion that the evidence does not prove any *unlawful* act on the part of the defendant and that the case should not have been submitted to the jury on such an issue. Plaintiffs did not allege or rely upon any negligent act or acts of the defendant in doing *a lawful thing,* i. e., the construction of its roadbed, together with ditches and outlets, over land where it had the right to construct the same. If plaintiffs can properly plead and prove some *negligence* on the part of the defendant resulting in

damage to them, then they would be entitled to recover. For this reason, we think the cause should be remanded.

It follows that the judgment is reversed and the cause remanded. All concur.