Holland HOUFBURG, Respondent,

v.

KANSAS CITY STOCK YARDS COMPANY
OF MAINE and Melvin F. Hart,
Appellants.

No. 44526.

Supreme Court of Missouri.

Division No. 1.

Sept. 12, 1955.

Motion to Remand or for Rehearing or to Transfer to Court en Banc Denied and Opinion Modified on Court's Own Motion Oct. 11, 1955.

Opinion on Rehearing Modified on Court's Own Motion and Motion to Set Aside Modified Opinion and for Rehearing or to Transfer to Court en Banc Denied Nov. 14, 1955.

Roscoe C. Van Valkenburgh, Wilfred Wimmell, Kansas City, for appellants, Brenner, Van Valkenburgh & Wimmell, Kansas City, of counsel.

Lyman Field, Rogers, Field & Gentry, Bernadine C. LeBerthon, Kansas City, for respondent.

HOLMAN, Commissioner.

Action to recover damages for personal injuries sustained by plaintiff, Holland Houfburg (respondent) on September 21, 1949, while he was in the performance of his duties as an employee of Producers Commission Association at the Kansas City Stockyards. He obtained a verdict and judgment for $50,000 against the defendants Kansas City Stock Yards Company and Melvin F. Hart, its maintenance supervisor. The defendants have duly appealed.

For about two months prior to the accident plaintiff had worked for Producers as a yardman. His duties included the yarding, handling and watering of cattle. On the morning in question he had just completed cleaning the trough in pen 37–36 and refilling it with water. As he started to climb upon the fence the heavy trough was in some manner tipped over and plaintiff's left leg was caught between the trough and a feed manger. This, according to the evidence, may have been caused by plaintiff's weight thereon in his effort to boost himself upon the fence, or it may have been pushed over by the cattle. The injuries received by plaintiff were very painful and serious, resulting in some permanent disability. However, the view we take of the case makes it unnecessary to describe his injuries in any detail.

There was evidence from which the jury could have found that certain employees of Producers had notified the maintenance department of the Stock Yards Company three days before the accident that the trough was loose (wobbly) and needed repairing. Plaintiff's main instruction predicated liability upon a finding that the trough was not reasonably safe, in that it was not securely anchored to the fence and was unstable and likely to fall; that said condition had been reported to defendants and that they had had sufficient time and opportunity to repair same and negligently failed to do so and failed to maintain and place said trough in a reasonably safe condition.

Almost a year after the injury plaintiff settled his claim for workmen's compensation benefits against Producers and its insurer. Thereafter, this suit for damages was instituted.

At the outset defendants urge that the trial court erred in overruling their motions for a directed verdict. They argue that the injury occurred in a pen that had been leased to Producers and that the alleged failure of defendant Stock Yards Company to perform its contractual obligation to make repairs would not support an action in tort for personal injuries that may have resulted therefrom.

It appears that the relationship of landlord and tenant existed between the Stock Yards Company and Producers. This was substantially admitted by the parties since plaintiff alleged in his petition, and defendants admitted in their answers, that "defendant Kansas City Stock Yards Company leased various of its pens to various commission companies and concerns, including plaintiff's employer * * *." The only substantial evidence of the details of the rental agreement came from Mr. Dillingham, the president of the Stock Yards Company, who testified that in September, 1949, the Company had an oral "leasing agreement" with Producers whereby office space and 106 pens were provided for a rental of $285 a month, plus a charge per head on each head of livestock placed in the pens. He stated that his company agreed to make repairs when notified and requested to do so and would make same at a time convenient to Producers. Likewise, it was agreed that the pens would be cleaned upon request, this being required about once a week. This witness further stated that Producers had full control of the cattle after they were unloaded from the truck or railroad car. They could place them in any pen within their leased space and had the right to exclude employees of the Stock Yards Company from the pens. Jeremiah Galvin, a former employee of Producers, said that these were Producers' pens and when they had cattle to put in them no one else could get in there. He stated, however, that if the pens were empty others would come in and yard cattle in them. Herman Smith, an em-

ployee of Producers, testified that Producers had had these pens (including 37–36) during the 12 years or more that he had worked there.

 A landlord, in the absence of a contract so to do, is under no obligation to make repairs to the rented premises. Mahnken v. Gillespie, 329 Mo. 51, 43 S.W.2d 797. In the instant case the Stock Yards Company (landlord) did agree to make repairs upon request. However, defendants point out that since the case of Kohnle v. Paxton, 268 Mo. 463, 188 S.W. 155, it has been well established in this state that a landlord cannot be held liable in tort for personal injuries received by a tenant, or one rightfully on leased premises, as a result of the landlord's breach of his covenant to repair. The tenant alone has a cause of action and that is one for damages for breach of the contract. Lahtinen v. Continental Building Co., 339 Mo. 438, 97 S.W.2d 102; Turner v. Ragan, Mo.Sup., 229 S.W. 809; Grimmeissen v. Walgreen Drug Stores, Mo. App., 229 S.W.2d 593; Home Owners' Loan Corporation v. Huffman, 8 Cir., 124 F.2d 684; Norris v. Walker, 232 Mo.App. 645, 110 S.W.2d 404; Davis v. Cities Service Oil Co., Mo.App., 131 S.W.2d 865. For an analogous situation, see Lowery v. Kansas City, 337 Mo. 47, 85 S.W.2d 104.

We have carefully considered plaintiff's pleadings, proof, submission, and his brief in this court and conclude that it is plaintiff's contention that, while conceding that there was a rental arrangement whereby the Stock Yards Company rented certain facilities (including stock pens) to Producers, and conceding further that such rental or lease arrangement did in one sense constitute a landlord-tenant relationship between the Stock Yards Company and Producers, nevertheless, the arrangement under the instant circumstances was not a "mere" landlord-tenant relationship and therefore the law relating to a lessor's tort liability for breach of an agreement to repair is not applicable. The reason advanced by plaintiff for the inapplicability of the aforementioned rule is that under the terms and provisions of The Packers and Stockyards Act

of 1921, 7 U.S.C.A. § 201 et seq., the defendant Stock Yards Company is a public utility required by said law to furnish reasonable stockyard services and hence is liable for its negligence in carrying out that duty. No case is cited wherein a stockyard owner has been held liable in tort under facts such as exist in the instant case. To support his contention plaintiff relies mainly upon the specific provisions of the Act and somewhat general statements contained in various cases construing it. We will therefore examine that Act to determine whether there is anything therein which creates any duty as between the Stock Yards Company and plaintiff which was breached by said Stock Yards Company.

 The Packers and Stockyards Act was enacted in order to remedy abuses that had grown up in the large stockyards of the country in that packers, stockyards owners, commission men and dealers were engaging in unfair, monopolistic and discriminatory practices, the details of which need not be related here. The Act provides: "It shall be the duty of every stockyard owner and market agency to furnish upon reasonable request, without discrimination, reasonable stockyard services at such stockyard * * *." "All rates * * * shall be just, reasonable, and nondiscriminatory * *." "It shall be the duty of every stockyard owner and market agency to establish, observe, and enforce just, reasonable and non-discriminatory regulations and practices in respect to the furnishing of stockyard services * * *." Sections 205, 206, 208. The Secretary of Agriculture is given broad regulatory powers over the rates, charges and practices of stockyard owners and market agencies.

In Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 402, 66 L.Ed. 735, 23 A.L.R. 229, the Act was held valid and the court, after discussing the background of the legislation, stated: "The act, therefore, treats the various stockyards of the country as great national public utilities to promote the flow of commerce from the ranges and farms of the West to the consumers in the East. It assumes that they conduct a business affected

by a public use of a national character and subject to national regulation."

■ It should be here noted that a stockyards company is not granted a franchise by the state or federal government and it does not necessarily have a monopoly. However, as we have already shown, the business is affected with a public use and is a proper subject for regulation because of its public nature. Stafford v. Wallace, supra.

■ We have indicated the general purposes of The Packers and Stockyards Act. "Congress had no intention of regulating the entire business of the livestock and meat industry. Certainly there is no indication in the history of the legislation, in the Act itself or the interpretation of it by the courts that justifies the conclusion that the Act was designed to supersede local laws pertaining to the well established principles of agency, sales of personal property, chattel mortgages and many other branches of the law. * * * the conduct prohibited always is unjust discrimination, unfair rates or practices, and unreasonable rules." De Vries v. Sig Ellingson & Co., D.C., 100 F.Supp. 781, 786, 787, affirmed, 8 Cir., 199 F.2d 677. Subject to reasonable regulation, the right to control and conduct the business of a stockyards company remains in the company just as it did before the enactment of the Act. Acker v. United States, D.C., 12 F.Supp. 776, affirmed 298 U.S. 426, 56 S.Ct. 824, 80 L.Ed. 1257; Farmers Union Livestock Ass'n v. St. Paul Union Stockyards Co., D.C., 97 F.Supp. 539; Fort Worth Stockyards Co. v. Brown, Tex.Civ. App., 161 S.W.2d 549.

Plaintiff relies strongly upon a statement in Kirk v. St. Joseph Stock Yards Co., 8 Cir., 206 F.2d 283, 287, 40 A.L.R.2d 980, as follows: "Defendant as the owner and operator of a commercial stockyard which was a public utility subject to reasonable regulations, had the duty of furnishing, upon reasonable request, without discrimination, reasonable stockyard service and to establish, observe and enforce just, reasonable and non-discriminatory regulations and practices in respect to the furnishing of stockyard service. Packers and Stockyards Act of 1921, 7 U.S.C.A., Sec. 201 et seq. As to the specific duties imposed upon it as such a public utility it could not escape liability for the failure to furnish such a service or for negligence in connection with the service so required by delegating to others the duty to perform it." He specifically points to the last sentence of the quotation as a basis of defendant's liability here. As we view the situation this statement is of no benefit to plaintiff. In leasing certain pens to Producers the defendant Stock Yards Company was not seeking to delegate the performance of a duty. In so doing said defendant was actually complying with its duty under the Act to furnish reasonable stockyard facilities to an established market agency. The Kirk case so holds. Stated more in detail, we think that under the Act this defendant was required to have pens available for the use of shippers who desired to market or purchase livestock without using the services of a commission company. It also had a duty to furnish facilities to market agencies and dealers. It is evident that at some time prior to September, 1949, Producers had made a request to this defendant for stockyard facilities. The oral lease of office space and pens was the culmination of that request. Furnishing stockyard facilities under this "leasing agreement" was the performance of a duty this defendant owed to Producers, but it did not delegate to Producers any duty owed to any one else.

The Kirk case is also relied upon by defendant Stock Yards Company in its reply brief. The actual holding in the case would appear to support the contention of said defendant. In that case, St. Joseph Stock Yards Company leased a portion of its premises to the Williams Feeding Company so that said company could engage in the business of feeding and caring for sheep. Plaintiff delivered a large number of sheep to Williams Feeding Company to be cared for and fed. Dogs entered the pens and chased the sheep causing the death of 471 lambs. The enclosure was not such as to prevent the entry of dogs and there was no watchman to protect the sheep from such a

raid. Plaintiff brought suit for damages against the Stock Yards Company under the Packers and Stockyards Act, contending that said defendant failed to furnish proper facilities and services as required by said Act. It was further alleged that said defendant Stock Yards Company provided a watchman in connection with services it furnished in feeding sheep for Swift and Company, but no watchman was provided to protect the area leased to Williams Feeding Company. This latter allegation was admitted by the Stock Yards Company. The trial court directed a verdict for defendant and the ruling was affirmed on appeal. The court held that all of plaintiff's dealings were with Williams Feeding Company and that the action of the defendant in leasing a portion of its premises to said Feeding Company was not a delegation to it of any duty which, as a public utility, the Stock Yards Company owed to plaintiff.

█ What we have heretofore said will indicate our view that there is no provision in the Act that is applicable to the factual situation here presented and that would control the issue of liability as it concerns the landlord-tenant relationship existing between defendant Stock Yards Company and Producers. Thus we are required to invoke the rule, heretofore discussed, which would bar plaintiff from recovery for the injury occurring in the area rented by Producers.

█ Plaintiff has also called our attention to Sections 276.010 and 276.040, RSMo 1949, V.A.M.S. The first section mentioned merely provides that stockyards are declared to be public markets. Section 276.040 makes it unlawful for a public market to discriminate against any one buying, selling or exchanging livestock. We cannot see that these sections are of benefit to plaintiff. They merely establish the fact that a stockyard is a type of public utility, subject to some state as well as federal regulation.

█ Next, plaintiff contends that the liability of defendant Stock Yards Company is measured in the same fashion as the liability of a railroad to the employees of a shipper when the railroad furnishes the shipper with a defective car. He correctly states that such liability arises out of a duty imposed by law and not from privity of contract. Cases cited in support of this contention are St. Louis-San Francisco Ry. Co. v. Ewan, 8 Cir., 26 F.2d 619; Markley v. Kansas City Southern Ry. Co., 338 Mo. 436, 90 S.W.2d 409, 411–414; Settle v. Baldwin, 355 Mo. 336, 196 S.W.2d 299; Willis v. Atchison, T. & S. F. Ry. Co., 352 Mo. 490, 178 S.W.2d 341. Unquestionably, it is a carrier's duty to use ordinary care to deliver cars reasonably safe for the use of shippers and their employees. However, we find nothing in this rule that would impose liability on the defendants under the facts in the instant case. Liability under this rule is not imposed upon a railroad because it is a public utility. It is a common law rule relating to those furnishing chattels. It is sometimes stated generally that any person furnishing a chattel for a use in which he has a business interest may be liable for his negligence to any one who may reasonably be expected to be in the vicinity of its probable use. 2 Restatement of Torts, Section 392. A more specific statement appears in Prosser on Torts, Section 83, p. 685: "The lessor of a horse or an automobile is liable to a passenger in the vehicle or a person run down on the highway, not only if he knows that the chattel is dangerously defective at the time it is supplied, or that the person entrusted with it is incompetent to deal with it, but also if he merely fails to make reasonable inspection to discover possible defects before turning it over. The same responsibility has been imposed upon a caterer serving food to the plaintiff under contract with another, and upon a shipper of goods where a servant of the consignee is injured while unloading a defective vehicle which the shipper has furnished for transportation. Although there are cases to the contrary, the prevailing view is that a railway company is under a duty of reasonable inspection before turning over its cars, and that the obligation extends to employees of a

shipper, of a consignee, and of a connecting carrier." There is another reason why this rule, relating to chattels, would not afford plaintiff a recovery in this case. There must be proof that the defect existed at the time the owner made delivery of the chattel. Markley v. Kansas City Southern Ry. Co., supra. The theory upon which the instant case was tried was that defendants were negligent in failing to repair the trough and maintain it in a reasonably safe condition. There was no evidence that the defect existed at the time possession of the pen was delivered to Producers.

■ Finally, plaintiff contends that he was an invitee of defendant Stock Yards Company upon the premises when he was injured. He does not argue that there was any direct evidence to that effect but urges that he was impliedly invited since the use of the pen by Producers was also of mutual benefit to the Stock Yards Company as they supplied the feed and received a yardage fee for each animal placed in the pens. The cases cited by plaintiff, Gilliland v. Bondurant, 332 Mo. 881, 59 S.W.2d 679, Alexander v. Crotchett, 233 Mo.App. 674, 124 S.W.2d 534, Maisch v. Kansas City Stock Yards Co. of Maine, Mo.App., 241 S.W.2d 487, and Stafford v. Wallace, supra, do not sustain his contention. Since it appears that Producers was in possession of the pen as a tenant, it necessarily follows that plaintiff was an invitee of the tenant (his employer) and not of the Stock Yards Company. Bender v. Weber, 250 Mo. 551, 157 S.W. 570, 46 L.R.A.,N.S., 121; Grimmeissen v. Walgreen Drug Stores, supra.

We have concluded that plaintiff was not entitled to recover against the defendant Stock Yards Company because of the rule that a landlord cannot be held liable in tort for personal injuries received on the leased premises as a result of the landlord's breach of his agreement to repair, and its motion for a directed verdict should have been sustained. Since the liability of defendant Hart was based upon his negligence in the performance of his duties as maintenance supervisor (agent) of the Stock Yards Company, his motion for a directed verdict should also have been sustained.

The judgment is reversed.

VAN OSDOL and COIL, CC., concur.

PER CURIAM.

The foregoing opinion by HOLMAN, C., is adopted as the opinion of the court.

All concur.

On Motion for Rehearing.

HOLMAN, Commissioner.

Plaintiff has filed a motion in which he prays that we modify the ruling in our opinion requiring that the judgment be reversed outright, and that the cause be remanded for a new trial in the "furtherance of justice." In support of this motion he states that there is evidence in the record (which can be amplified upon a new trial) that as regards the pen in question the relationship between the Stockyards Company and Producers was not, in fact, that of landlord and tenant. He frankly concedes that in his petition the allegation was made that said defendant "leased various of its pens to various commission companies and concerns, including plaintiff's employer," and that this allegation was admitted by defendants. It is further stated that when this allegation was made plaintiff was proceeding on the theory that because said defendant was made a public utility by the Packers and Stockyards Act it would make no difference as to the technical relationship existing between Producers and the Stockyards Company. He points out that the instant case is the first one in which this court has construed the Packers and Stockyards Act in respect to the duties imposed upon stockyard companies in furnishing reasonable services to shippers and market agencies and the legal effect of the negligent performance of these duties upon claims such as the plaintiff's.

We are convinced from an examination of the record that the allegation concerning

the leasing of the pens was made by plaintiff without any realization that it would establish a complete defense to his claim. The issue upon which we reversed the judgment was not pleaded in the answer of said defendant nor (as far as appears from the record) was it called to the attention of the trial court prior to the filing of the motion for new trial. Hence it appears that there was no real contest in the trial as to the relationship between Producers and the Stockyards Company.

The arrangement between this defendant and Producers was oral. In the event the evidence raised an issue of fact as to the relationship created by this agreement, that fact issue should be submitted to the jury under proper instructions. Marden v. Radford, 229 Mo.App. 789, 84 S.W.2d 947. In his verified motion plaintiff has stated alleged facts in the nature of newly discovered evidence. This we must disregard. However, there is sufficient evidence in the record before us to have authorized a submission of an issue to the jury as to whether there was, in fact, a landlord-tenant relationship. We recognized this at the time our original opinion was prepared, but such was disregarded because of the aforesaid allegation in plaintiff's petition.

There is evidence to indicate that the Stockyards Company allots to a commission company such pens as it appears to need and that, as compensation for such use, the commission firm will collect from the shipper a charge per head for the stock placed in the pens and transmit it to the defendant. A like arrangement is followed in regard to feed, all of which is required to be purchased from the Stockyards Company. We also refer to the testimony of Jeremiah Galvin, a yard man for Producers, as follows: "Q. Do you know who actually leased or rented those pens when they were allotted to them by the stock yards company? A. Well, as far as I am concerned or as far as I know, I never knew the pens were leased or rented to a firm because anybody could come into that alley and yard cattle any time they wanted to, if the pens were empty. I didn't know they were ever leased." As we have indicated, we think (disregarding the admission in the pleadings) that the evidence would justify a submission to the jury of the issue as to whether Producers was a tenant or whether defendant remained in control of the pens and permitted Producers to use them in consideration for which Producers collected yardage from the shipper and transmitted it to defendant.

We now reach the important question as to whether we should remand the case so that plaintiff may amend his petition in such manner as will permit a determination of the aforementioned issue upon another trial. No exact rule has been formulated which will govern this decision. The question must be determined according to the facts and circumstances in the particular case under consideration.

This court has frequently approved the statement of Judge Bennick in Smith v. Terminal R. Ass'n of St. Louis, Mo.App., 160 S.W.2d 476, 479, that "The furtherance of justice requires that a case should not be reversed without remanding unless the appellate court is convinced that the facts are such that a recovery cannot be had; and even though the plaintiff fails to substantiate. the theory upon which his case was tried, if he nevertheless shows a state of facts which might entitle him to recover if his case were brought upon a proper theory, the judgment will not be reversed outright, but instead, in the exercise of a sound judicial discretion, the case will be remanded to give him the opportunity to amend his petition, if so advised, so as to state a case upon the theory which his evidence discloses." See East v. McMenamy, Mo.Sup., 266 S.W.2d 728; Stone v. Farmington Aviation Corp., 363 Mo..803, 253 S. W.2d 810; Cudney v. Midcontinent Airlines, 363 Mo. 922, 254 S.W.2d 662; White v. Wabash R. Co., 240 Mo.App. 344, 207 S.W.2d 505; O'Neal v. Mavrakos Candy Co., Mo.Sup., 263 S.W.2d 430.

However, the rule has its restrictions. For example, we have held that where a

plaintiff abandoned his assignments of primary negligence and requested a humanitarian submission only, and thus secured a strategic advantage in avoiding the defense of contributory negligence, the case will not be remanded if, on appeal, it is determined that he failed to make a submissible humanitarian case. Smith v. St. Louis Public Service Co., Mo.Sup., 259 S.W.2d 692.

In the instant case plaintiff sought no strategic advantage in making the allegation. It was a misadventure resulting either from a mistaken idea of the facts or a misunderstanding of the applicability of an important rule of law. We have concluded that a prudent exercise of judicial discretion requires that this cause be reversed and remanded.

Since the case will likely be retried we should now consider two assignments in the appellant's original brief relating to the exclusion of evidence.

The record shows (although not disclosed to the jury) that Travelers Insurance Company, as Producer's insurer, paid medical expenses in the sum of $3,328.25 and workmen's compensation benefits to plaintiff in the sum of $1,293.75. Thus, under Section 287.150, RSMo 1949, V.A.M. S., the Travelers was subrogated to any recovery by plaintiff against defendants, to the extent of the sum of $4,622 paid by it. The interest of this insurance company in the successful prosecution of plaintiff's alleged cause of action against defendants is therefore apparent.

During the period of his hospitalization plaintiff was treated extensively by Dr. Walton Ingham who performed a series of operations. The results of many of the medical and surgical efforts made in behalf of plaintiff were discouraging if not unfortunate. Dr. Ingham was paid $764 by Travelers Insurance Company for his services. At the trial, Dr. Ingham testified in detail as to the treatment administered to plaintiff, the severe pain suffered by him and his resulting disability. Defendants, for the purpose of showing bias and prejudice on the part of Dr. Ingham and impeaching his testimony, made an extended offer of proof (out of the hearing of the jury) which is summarized in their briefs as follows: "Defendants offered in evidence five reports from Dr. Ingham to Travelers Insurance Company, dated November 9, 1949, December 1, 1949, December 19, 1949, February 2, 1950, and April 26, 1950, wherein statements appeared which conflicted with his testimony at the trial. Defendants also offered to prove that he was paid by Travelers Insurance Company and employed by that company; that when the Travelers Insurance Company was defending the compensation case Dr. Ingham was prepared to testify that the disability of Holland Houfburg did not exceed 25% disability in the left leg and that Houfburg was at the time free from pain; that Dr. Ingham and his associate have performed other services for Travelers Insurance Company for which they have received substantial compensation and that Dr. Ingham knew that if his testimony was favorable to Houfburg, his employer, Travelers Insurance Company, would recover all that it had paid." The court substantially rejected the offer since it was ruled that no evidence would be admitted and no use could be made of the exhibits which would disclose to the jury the name of the Travelers Insurance Company or that it had employed or paid Dr. Ingham or had any interest in the case.

We are convinced that the court erred in excluding this evidence. It may be conceded that the fact of payment by an insurer of workmen's compensation benefits and the consequent pro tanto subrogation of the insurer is ordinarily irrelevant in a suit of this nature and should be excluded. Pritt v. Terminal R. Ass'n of St. Louis, Mo.Sup., 251 S.W.2d 622. However, this rule does not apply where it becomes necessary to make such a disclosure in order that the jury may properly evaluate the testimony of a witness. The interest or bias of a witness and his relation to or feelings toward the parties are never irrelevant matters. Any litigant should be freely accorded the right to cross-examine an adverse witness and the court should not unduly

restrain or interfere with the exercise of that right. It is elementary that evidence that is relevant and material for one purpose cannot be excluded solely because it might be inadmissible for some other purpose. To exclude the evidence offered by defendants would be creating an exception to the universal rule that the pecuniary interest of a witness, or his bias or prejudice, can always be shown, subject only to such limitations upon the extent of the inquiry as may be imposed by the trial judge in his sound discretion. Under the circumstances indicated the jury was entitled to know of any prior inconsistent statements made by the witness, the relationship between the witness and the Travelers Insurance Company and that said insurer had a substantial interest in any judgment plaintiff might obtain. Jablonowski v. Modern Cap Mfg. Co., 312 Mo. 173, 279 S.W. 89; Sprinkle v. Davis, 4 Cir., 111 F.2d 925, 128 A.L.R. 1101; Snyder v. Wagner Electric Mfg. Co., 284 Mo. 285, 223 S.W. 911; Dodd v. Independence Stove & Furnace Co., 330 Mo. 662, 51 S.W.2d 114; State ex rel. Tramill v. Shain, 349 Mo. 82, 161 S.W.2d 974; Warner v. Oriel Glass Co., 319 Mo. 1196, 8 S.W.2d 846, 60 A.L.R. 448.

■ Defendants offered in evidence the "Report of Injury" which was apparently filed by Producers with the Division of Workmen's Compensation. It appeared that this was offered primarily because it recited that the injury occurred when "a steer fell in the water trough, tipping the water trough over on him [plaintiff] and pinning his foot between the water trough and the hay manger." Plaintiff objected for the reason that the report was hearsay and not binding upon him. The objection was sustained.

It appears that Producers paid plaintiff his salary for two months following his injury ($400) and that in October, 1950, plaintiff verbally agreed with Producers that it would be repaid out of any recovery he might obtain from the defendants and this agreement was confirmed in a letter written by plaintiff's attorneys in 1953. It is this possible interest of Producers in the ultimate judgment that is relied upon by defendants as the basis for the admissibility of this report as an admission against interest. In considering this question it should be promptly noted that this was not offered to impeach any witness and therefore our discussion regarding the other excluded evidence would have no application here.

We think the court ruled properly in excluding this report. We find nothing in the record that would make this report binding on the plaintiff. No authority is cited in the brief which would indicate that it would be admissible for any purpose, under the circumstances shown in this case. It should be obvious that the court could not admit in evidence a declaration that might be damaging to plaintiff simply because it may have been made by a creditor whom plaintiff had agreed to pay if he collected a judgment in the cause.

For the reasons heretofore indicated, the cause is reversed and remanded.

VAN OSDOL and COIL, CC., concur.

PER CURIAM.

The foregoing opinion by HOLMAN, C., is adopted as the opinion of the court.

All concur.